973 So.2d 782 (2007)
STATE of Louisiana
v.
Derrick LONDON.
No. 07-KA-473.
Court of Appeal of Louisiana, Fifth Circuit.
November 27, 2007.
*783 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, (Appellate Counsel), Anne Wallis, (Appellate Counsel), Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee, The State of Louisiana.
Bruce G. Whittaker, Attorney at. Law, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant, Derrick London.
Panel composed of Judges SUSAN M. CHEHARDY, FREDERICKA HOMBERG WICKER, and GREG G. GUIDRY.
SUSAN M. CHEHARDY, Judge.
Derrick London appeals his conviction of second degree murder. We affirm, but remand for correction of a patent error.
On August 18, 2005 Derrick London was indicted for violation of La.R.S. 14:30.1 by second degree murder of Otis Mitchell. On August 19, 2005 the defendant entered a plea of not guilty. On September 27, 2006, the defendant's motion to suppress statements was denied, but his oral motion for mistrial was granted.[1] The trial was *784 re-set. The second trial commenced on December 13, 2006 and concluded on December 14, 2006. The jury returned a verdict of guilty as charged.
On March 9, 2007, the trial court denied the defendant's motion for new trial and sentenced the defendant to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. This timely appeal follows.
FACTS
Dr. Susan Garcia, an expert in the field of forensic pathology, testified she performed an autopsy on the body of Otis Mitchell on June 13, 2005. Dr. Garcia said the victim had multiple gunshot wounds, consisting of four entrance wounds and one exit wound. Two of the entrance wounds and the exit wound were on his torso; one entrance wound was to his left arm, from the back; and the fourth entrance wound was above his left buttock. Dr. Garcia could not determine the order in which the wounds were received. She said they were distance-range wounds, but could not determine the distance, which could have been from three feet to 300 feet.[2]
Dr. Garcia testified three impact projectiles were recovered from the body. Because of the exit wound, no fourth projectile was found in the body. The doctor identified State's Exhibits 1 through 5 as pre-autopsy photographs of the body that accurately depict the location of the entrance wounds. She identified. State's Exhibits 7, 8 and 9 as the projectiles recovered from the body: Exhibit 7 is a fully copper-jacketed medium-caliber projectile. Exhibit 8 is a deformed projectile with a copper wash, with a clearly identifiable base that she would refer to as medium caliber. Exhibit 9 is a slightly deformed copper-jacketed medium-caliber projectile.
Dr. Garcia testified a toxicology screen disclosed there was cocaine in the victim's urine and blood, and cocaine metabolites in his urine that indicated the victim probably ingested cocaine within two hours prior to his death.
Tim Scanlan, assistant director of the crime laboratory and a firearms examiner expert, testified he was given the projectiles recovered in the autopsy and was asked to determine the general class of those projectiles. Because no murder weapon was recovered, the ballistic evidence included what was recovered at the scene and during the autopsy.
Scanlan identified State's Exhibit 7 as a copper-jacketed projectile, State's Exhibit 8 as an unknown caliber lead-like projectile, State's Exhibit 9 as another metal-jacketed projectile, and State's Exhibit 10 as an unknown caliber metal-jacketed projectile. He determined that the metal-jacketed projectiles, State's Exhibits 7, 9 and 10, were consistent with .38-caliber class ammunition and possessed six lands and grooves with a right twist. Scanlan explained this was most consistent with revolver-type ammunition, most likely from a .38 special or a 357 magnum. State's Exhibit 11 was an unfired .25 caliber cartridge, which Scanlan said was not recovered at the scene but through a *785 search warrant. He said it was a loose cartridge found at a residence.
The victim's arm tested positive for gunshot residue. Scanlan testified it is common for a shooting victim to test positive for gunshot residue. He explained a positive result could be from a distant shooting, maybe up to seven or eight feet away. He could not give a more accurate distance determination without a murder weapon.
Scanlan distinguished gunshot residue from stippling, saying that three feet is the maximum for stippling because enough force is needed for the gunpowder to embed itself in the skin, while gunshot residue can be deposited at a greater distance. He explained that stippling is caused by gunpowder debris imbedding in the skin, as opposed to simply being deposited on the skin. He agreed that one possible explanation for the gunshot residue on the victim could be that the shooting occurred from a distance between three feet to seven or eight feet.
Sergeant Billy Lewis testified he is assigned to the Jefferson Parish Sheriff's Office 911 center. He identified State's Exhibit 12 as a cassette tape of the 911 call relating to the shooting in this case. Exhibit 12 was played for the jury.[3]
Detective Roger Gorumba testified that on June 11, 2005, he responded to a 911 call about multiple gunshots fired and a murder in the 1100 block of Clydesbank, a neighborhood in Harvey. Police found a body in a breezeway between two sets of apartments that face each other, in front of Apartment B at 1157 Clydesbank. When Detective Gorumba arrived, the body had already been removed. There was a small amount of what appeared to be blood at the site where the body was found.
The victim's clothing, which had been cut away when the medical technicians rendered aid, was still on the scene. Police discovered a projectile in the clothing. They also found a twenty-dollar bill, which Detective Gorumba said was unusual because of the foot traffic in that area. Police were unable to find any other evidence, such as projectile damage or bullet casings, in the area. Detective Gorumba identified State's Exhibits 14 through 34 as photographs of the crime scene and said they depicted the scene as he found it.
By the following day, police had developed information that enabled Detective Gorumba to obtain an arrest warrant for Derrick London. The defendant was arrested and was taken to the Investigations Bureau for questioning about the incident. Gorumba said the defendant made several statements while being interviewed over the course of several hours. Two of the statements were recorded on audiocassettes, and also were transcribed. These were played for the jury.
In the first statement, the defendant said that he, his cousin Ty Harell, his brother Gerald London, a girl named Nieka, and his friend Wesley were sitting outside at his mother's house at 1108 Clydesbank. The victim was causing a disturbance in front of the house. The defendant initially stated, "So a dude that jacked me my 840.00 and me and him had like a little word, word for word." The defendant then said the victim was jacked and that they argued. (He explained "jacked" meant, "He wanted to buy drugs and he gave the dude the money, and the dude never came back with it.")
The victim was told not to come back, but a few minutes later the defendant saw *786 him walking back down the street, still aggravated. The defendant and five others were walking in the street when they saw the victim coming with a knife, which was "cuffed" along his forearm. He described the knife as longer than a kitchen knife, with a brown handle, another piece sticking out of the back, and a chip on the front of it. He could not remember which hand the knife was in.
The defendant said the victim kept coming towards him with the knife, saying, "[B]itch, I just lost my $40.00, somebody jacked me, bitch. I want some money, bitch, come on, I want some money." The defendant stated a "dude" gave him a gun, which he described as "big like a 40, between a 40 or a 45." He thought the person who gave him the gun was named Trey. (In his second statement, the defendant referred to the person who gave him the gun as "Tory.")
The defendant said he shot the victim about three times to defend himself. He explained that after the victim was shot he fell to the ground and dropped his knife; however, the victim got back up, cursing and holding the knife towards the defendant after picking it up. The defendant shot the victim two more times. Then, the victim ran through the "cut" and did not come out again. The defendant thought the knife might still be there on the sidewalk in the grass. The defendant explained that the shooting happened in an area where trees had been knocked down. He agreed to go to the scene and show the detective where the incident happened.
The defendant said that after the shooting, he gave the gun back to Trey. He then went to his house and smoked a cigarette while sitting on the step. He later saw the police respond. He told his sister Danielle what happened first and she told his mother and brother. According to the defendant, the victim recently stabbed him on his left forearm after the victim asked the defendant for a bag of weed. The defendant went to the hospital for treatment of the wound, but he did not press charges because he feared he would be killed. The defendant said he knew if he got stabbed again he would lose, his life.
Detective Gorumba explained that the cousin and brother mentioned in the defendant's first statement were reluctant to be interviewed. According to Detective Gorumba, after the defendant's first statement he was unable to understand exactly where the incident took place, so the defendant agreed to go there and demonstrate the incident for Gorumba.[4]
Between the first and second statement, they went to the scene. Detective Gorumba testified the defendant was talking about the same area at 1157 Clydesbank, but about 100 or so feet further down in a vacant lot. The defendant described the alleyway where the victim's body was found as the "cut," and stated that the incident occurred next to a large tree. He showed the detective where he was alongside the sidewalk, and where the victim was standing by the tree, which Detective Gorumba estimated to be about 12 to 15 feet away, when the defendant fired the first shot. The defendant said the victim produced a knife and he felt threatened, so he was able to arm himself with a gun.
Although the body, the blood, and the projectile were discovered in the alleyway, according to Detective Gorumba the search for evidence did include the vacant lot area including the area by the tree. The area with the tree was searched even before they received direct knowledge that the area was involved. The lot was *787 searched with a metal detector. They never found a knife.
Detective Gorumba also testified the police report from the prior stabbing reflected that the defendant said his brother cut him with a box cutter while they were "horsing around."
Deputy Alford McCoy testified he took the report on May 30, 2005 regarding the cutting. Upon arrival, Deputy McCoy talked to the mother, who advised him that her sons were playing in the living room with a box cutter and the defendant was cut by his brother. The defendant was taken to West Jefferson Hospital. Deputy McCoy went to the hospital, and the defendant said he and his brother were "horse-playing" when he received the unintentional cut, about two inches in length, to his left outer forearm. He did not want to press charges against his brother. Deputy McCoy did not speak to the brother. He was told the brother could not be located at the time.
The defendant's second statement was as follows: The defendant went to the scene after his first taped statement and showed the detective where the shooting occurred. The defendant explained he was in the street and walked towards the sidewalk in the grass. He said the victim was coming towards him from behind the tree to which the defendant brought the detective. The victim was walking towards him with a knife which was held along his forearm with the blade facing down.
The defendant stated he shot the victim once by the tree in the victim's shoulder and the victim fell and dropped his knife. He stated that the victim got back up and ran towards the "cut." The defendant said he did not know the victim "stayed" there. The defendant said he was running behind the victim because the victim was trying to kill him with a knife. The victim turned through a "cut" and the defendant shot him again in the breezeway of the two apartments. The defendant believed these shots hit the victim in his chest and in his side.
The defendant explained the "cut" was where the victim fell down between the apartment complex. The defendant stated when the victim went into the breezeway he believed he would try to jump the fence or turn the doorknob and defendant shot him again. He said a bald-headed man was standing outside and called the police. He stated he gave the gun to "Tory." Defendant brought the detective to where Tory lived.
Detective Gorumba had the defendant's body photographed, because the defendant indicated he received a previous injury from a confrontation with the victim which occurred less than two weeks prior to the shooting. Further, Detective Gorumba wanted to document any other injuries that may have occurred during the shooting.
Detective Gorumba testified he did not know how the defendant could claim self-defense when he shot the victim once in the back. He questioned how the defendant could be in immediate danger if the victim was not even facing him. He also pointed out that the victim was going into his house when he was shot in the back. He noted that the scene was searched and no knife was discovered. Detective Gorumba testified there was no evidence to indicate the shooting was in self-defense.
DNA found under the victim's right-hand fingernail was tested. The parties stipulated to the results, which indicated the DNA mixture was from the victim and from the defendant.
ASSIGNMENT OF ERROR NUMBER ONE
The defendant asserts the evidence was insufficient to support the verdict, because *788 the State failed to prove beyond a reasonable doubt that the killing was not in self-defense. The State responds that the jury was correct in concluding the defendant did not act in self-defense, based on the undisputed physical and testimonial evidence adduced at trial.
The standard of appellate review for a claim of sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Macon, XXXX-XXXX, p. 7 (La.6/1/07), 957 So.2d 1280, 1285; State v. Holmes, 98-490, p. 3 (La.App. 5 Cir. 3/10/99), 735 So.2d 687, 690.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372, 378 (La.1982); State v. Williams, 05-59, p. 5 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833.
When circumstantial evidence is used to prove the commission of an offense, La.R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Wooten, 99-181, p. 4 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208, citing State v. Captville, 448 So.2d 676, 678 (La.1984). This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. Id. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Id.
The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal. Macon, XXXX-XXXX at pp. 7-8, 957 So.2d at 1285-1286; State v. Rowan, 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
In the present case, to prove second degree murder, the State was required to prove (1) the killing of a human being, and (2) that the defendant had specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1); State v. Pagan, 04-1478, p. 10 (La.App. 5 Cir. 5/31/05), 905 So.2d 435, 441, writ denied, 05-2003 (La.2/17/06), 924 So.2d 1013.
Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). The determination of specific criminal intent is a question of fact. State v. Seals, 95-0305, p. 6 (La.11/25/96), 684 So.2d 368, 373, cert. denied, Seals v. Louisiana, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Gant, 06-232, p. 8 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1111, writ denied, 06-2529 (La.5/4/07), 956 So.2d 599.
Specific intent may be inferred from the circumstances and from the defendant's actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. State v. Graves, 99 p. 3 (La.App. 5 Cir. 8/31/99), 740 So.2d 814, 816, writ denied, 99-3013 (La.3/31/00), 759 So.2d 68. "The act of aiming a lethal weapon and discharging it *789 in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill." State v. Hidalgo, 95-319, p. 9 (La.App, 5 Cir. 1/17/96), 668 So.2d 1188, 1197.
The defendant does not argue the State failed to prove the elements of second degree murder. Instead, he contends the homicide was justifiable because the shooting was committed in self-defense. A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20(A)(1).
Further, "[a] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict" La.R.S. 14:21.
When a defendant claims self-defense in a homicide case, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. Gant, 06-232 at p. 8, 942 So.2d at 1111. In Gant this Court recognized the following principle:
The relevant inquiry on appeal is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. The determination of Defendant's culpability focuses on a two-fold inquiry, whether, from the facts presented, Defendant could reasonably have believed his life to be in imminent danger, and whether deadly force was necessary to prevent the danger.
06-232 at p. 9, 942 So.2d at 1111-1112.
In the present case, the court instructed the jury as to self-defense and the aggressor doctrine. Counsel presented the jury with two versions of the shooting: The State argued the defendant shot the victim without justification. The defense argued the homicide was committed in self-defense, that is, the victim had a knife on the day of the shooting and was coming toward the defendant. The defense further argued that the defendant's fear for his life also stemmed from a previous altercation with the victim where he stabbed the defendant. According to the defendant's taped statement, the defendant feared for his life since the victim had stabbed him less than two weeks before the shooting incident and then again displayed a knife on the day of the shooting.
The jury, however, apparently found the State's version of events, as presented by its witnesses, more credible. The jury could have believed, from the testimony of Detective Gorumba and Deputy McCoy, that the victim was not even involved in the prior stabbing, According to their testimony, at the time of that incident both the defendant's mother and the defendant stated the defendant's brother was responsible for the defendant's laceration.
Also, no knife was ever discovered, despite a search that involved a metal detector and included the location at which the defendant indicated the incident occurred. Even if a knife had been involved, according to the defendant the knife was dropped at some point. Further, according to the defendant's statement, five other people were with him at the time of the incident. Thus, the victim was outnumbered.
In addition, applying the aggressor doctrine, even if the jury believed the defendant's taped statements that the victim *790 was the aggressor initially, they could have believed, also based on defendant's statements, that at some point the defendant became the aggressor. See State v. Richards, 06-1553, pp. 16-19 (La.App. 3 Cir. 5/2/07), 956 So.2d 160, 171-172.[5]
In the present case, the State demonstrated that the victim was running away and the defendant was chasing the victim. It appears the victim was trying to enter his apartment to escape the gunfire. In his second taped statement the defendant stated that when the victim went into the breezeway, the defendant believed the victim would try to jump the fence or turn the doorknob, and so the defendant shot the victim again. The jury could have believed that if the defendant feared for his life, he could have let the victim escape instead of using deadly force to stop him from retreating.
Further, the State demonstrated that the victim was shot multiple times. Although the order of the shots was not determined, the defendant admitted in his statement that the first shot he fired hit the victim's shoulder. According to Dr. Garcia, the victim also received a gunshot wound just above his left buttock. Therefore, one of the shots that followed the first shot was fired when the victim was not facing the defendant.
In State v. Favorite, 03-425, p. 9 (La. App. 5 Cir. 11/25/03), 862 So.2d 208, 214, writ denied, 03-3529 (La.4/23/04), 870 So.2d 298, this Court recognized that the jury could have concluded the victim was the initial aggressor, but the defendant became the aggressor and his claim of self-defense was not supported by the facts of the case, including the findings that at least some of the bullets entered the victim from behind.
In this case, although the defendant's DNA was present under one of the victim's fingernails, the defendant did not claim he was injured by the victim, but only that the victim kept coming towards him. In the defendant's second statement, he also stated he saw a man outside calling the police. The jury could have believed he should have waited for the police to tell them the homicide was justified. Instead, the defendant watched the police respond from his porch.
We find the jury reasonably could have concluded the defendant could not have believed he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary under the circumstances to save himself. Thus, the jury reasonably could have found beyond a reasonable doubt that the defendant did not commit the homicide in self-defense.
ASSIGNMENT OF ERROR NUMBER TWO
The defendant requests an error patent review. This Court routinely reviews the record for patent errors regardless of whether defendant makes such a request, in accordance with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337, 338 (La.1975); State v. Weiland, 556 So.2d 175, 178 (La.App. 5 Cir.1990).
Although the commitment reflects that the trial judge informed the defendant of the prescriptive period for filing for post-conviction relief, the transcript does not reflect that the defendant was advised of the prescriptive period as required by La. C.Cr.P. art. 930.8.
*791 When there is a conflict between the transcript and the minutes, the transcript controls. State v. Lynch, 441 So.2d 732, 733 (La.1983). Therefore, we remand the matter for the trial judge to inform the defendant of the prescriptive period for filing for post-conviction relief. See State v. Allen, 06-778, p. 23 (La.App. 5 Cir. 4/24/07), 955 So.2d 742, 758.
For the foregoing reasons, the conviction and sentence are affirmed. We remand the matter for the trial judge to inform the defendant of the prescriptive period for filing for post-conviction relief by sending appropriate written notice to the defendant within ten days of the rendition of this Court's opinion and by filing written proof in the record that defendant received the notice.
CONVICTION AND SENTENCE AFFIRMED; REMANDED WITH INSTRUCTION.
NOTES
[1] The transcript of the hearing on the motion to suppress reflects that the matter was submitted and does not include a ruling on the motion. The September 27, 2006 minute entry reflects the motion was denied. The mistrial was granted because the State had just received the results of DNA testing and the defense requested time to review the results.
[2] Dr. Garcia testified pathologists use four general classifications of range for gunshot wounds. The most common is tight contact or close range, when the muzzle of a firearm is a few inches away from the skin and can deposit smoke and soot on the skin that is easily visible. Intermediate range can be from 18 inches to three feet, depending on the type of weapon and ammunition used. It leaves marks on the skin called stippling, which are unburnt pieces of powder and lead that exit the barrel and impact the skin. Any farther away is considered a distance range. At distance range, the doctor said, she cannot determine whether it is three feet or 300 feet.
[3] On objection by the defense, the court admonished the jury that the purpose of playing the tape was to establish the calls were made, not for the statements made on them. The court told the jury the statements are hearsay.
[4] Detective Gorumba identified the defendant in court.
[5] The court of appeal found the defendant's actions were not justified under his version of events, because after the first stab he became the aggressor when he sought confrontation with the retreating unarmed victim, even though the victim may have been the initial aggressor in the altercation.