STATE OF LOUISIANA

VERSUS

LANARD A. LAVIGNE

NO. 22-KA-282

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 18-6525, DIVISION "C"
HONORABLE JUNE B. DARENSBURG, JUDGE PRESIDING

May 24, 2023

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Stephen J. Windhorst, and John J. Molaison, Jr.

**CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED
FOR RESENTENCING WITH INSTRUCTIONS**
    **JGG**
    **SJW**
    **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Honorable Paul D. Connick, Jr.
Thomas J. Butler
Andrea F. Long
Douglas E. Rushton, Jr.

COUNSEL FOR DEFENDANT/APPELLANT,
LANARD A. LAVIGNE
Meghan H. Bitoun

**GRAVOIS, J.**

Defendant/appellant, Lanard A. Lavigne, appeals his convictions of second degree murder, obstruction of justice, and aggravated criminal damage to property. For the following reasons, we affirm defendant's convictions; however, we vacate defendant's sentences and remand the matter for resentencing and advisal of post-conviction relief as per La. C.Cr.P. art. 930.8, as instructed below.

## STATEMENT OF THE CASE

On January 31, 2019, a Jefferson Parish Grand Jury returned an indictment charging defendant, Lanard A. Lavigne, with the second degree murder of Kerwin Connor in violation of La. R.S. 14:30.1 (count one), obstruction of justice in violation of La. R.S. 14:130.1 (count two),[1] and aggravated criminal damage to property in violation of La. R.S. 14:55 (count three), all of which were alleged to have occurred on March 14, 2018. Defendant was arraigned on February 1, 2019 and pled not guilty.[2]

On September 23, 2019, defendant filed an "Unopposed Motion to Produce CAC Video Interview of Minor Child." The trial court granted the motion on that same day. Also, on September 23, 2019, defendant filed a "Motion *in Limine* to Introduce Evidence of Decedent's Reputation." Defendant also filed a memorandum in support of that motion.[3] On October 21, 2019, the State filed a response to that motion *in limine*, along with a motion to seal. That same day, the trial court ordered that the State's response and notice be sealed.

---

[1] Specifically, the indictment provides that defendant violated La. R.S. 14:130.1 in that "he did obstruct justice by tampering with evidence in a murder investigation by intentionally removing the handgun he used to commit the murder of Kerwin Connor from the crime scene[.]" Count three related to property damage caused by bullet holes.

[2] The parties also filed other pleadings; however, because these filings are not related to issues raised in the assignments of error, they are not discussed herein.

[3] In the memorandum, defense counsel argued that the victim had violently assaulted innocent persons and that his reputation for drug use and dealing was relevant as to his reputation for dangerousness. Counsel asserted that it was relevant to show defendant's apprehensive state of mind.

22-KA-282                                    1

On December 12, 2019, the trial court held a hearing on the motion *in limine*, and deferred rendering a ruling thereon until after both sides filed written memoranda. Thereafter, on January 17, 2020, the State filed a "Supplement [sic] Memorandum in Response to Defendant's Motion *in Limine* to Introduce Evidence of Decedent's Reputation." On February 3, 2020, defense counsel filed a supplemental memorandum in support of his motion *in limine*. That same day, the trial court denied defense counsel's motion *in limine*. Defense counsel subsequently filed a writ application with this Court challenging that ruling. On April 16, 2020, this Court denied the writ. *See State v. Lanard*, 20-K-113 (La. App. 5 Cir. 4/16/20) (unpublished writ disposition).[4]

On October 18, 2021, the State filed a notice of additional information, wherein it provided the statements of K.C.,[5] the victim's daughter, about the events of the shooting. On that same day, defense counsel filed a motion *in limine* to prohibit the introduction of any victim impact testimony and of the video containing the interview of the victim's daughter at the Child Advocacy Center ("CAC"). The trial court denied defendant's objections to the CAC video being played at trial.[6]

---

[4] There, this Court found no error in the trial court's ruling that defendant failed to present sufficient evidence to establish the victim's propensity for violence, or that the defendant was aware of any legitimate threat of violence. This Court found that the evidence of defendant's violent reputation was properly excluded because defendant was unaware of this reputation at the time of the incident. Further, this Court found that the vague testimony was insufficient to establish a reputation in the community and thus failed to establish that the victim had a reputation for violence. Finally, this Court held that the trial court properly ruled that evidence that the victim sold drugs was irrelevant and thus inadmissible, since there is no claim that the homicide was drug related or that neither the victim nor defendant was under the influence of drugs at the time of the homicide.

[5] Because this witness was a minor, her initials will be used to protect her identity. *See State v. Barnett*, 18-254 (La. App. 5 Cir. 4/3/19), 267 So.3d 209, 214 n.2.

[6] As is discussed below, at the start of trial, the trial court suggested that defense counsel review the CAC video and inform the court of anything prejudicial before the tape was played. During trial, defense counsel objected to the CAC video being played. The trial court noted that the parties discussed the motion *in limine*, and it was agreed that there was no victim impact testimony within the CAC video. After arguments, the court denied defense counsel's objection. Defense counsel again objected before the CAC video was played at trial, and the court overruled his objection.

According to minute entries included with the record, defendant withdrew his plea of not guilty and pled guilty as charged to count two (obstruction of justice) on October 18, 2021. Sentencing on count two was deferred until the day of sentencing on counts one and three.

On October 18, 2021, trial commenced before a twelve-person jury, and on October 21, 2021, the State filed a motion for a request for special jury charges, which was granted. On that same day, the jury unanimously found defendant guilty as charged on counts one and three.

On December 6, 2021, defendant filed a "Motion for New Trial and Motion for Post-Verdict Judgment of Acquittal,"[7] which the trial court denied prior to sentencing on that same day. After a waiver of delays, the trial court sentenced defendant on count one (second decree murder) to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence, on count two (obstruction of justice) to forty years' imprisonment at hard labor, and on count three (aggravated criminal damage to property) to fifteen years' imprisonment at hard labor.[8] The trial court further ordered that defendant's sentences "run concurrently with each other and with any other sentence."[9]

Immediately following the imposition of defendant's sentences, defense counsel made an oral motion to reconsider sentence and indicated that he would supplement the motion in writing. The trial judge replied, "Okay. And that's denied. You may supplement in writing[.]" On December 7, 2021, defendant filed

---

[7] Defense counsel filed one written motion. As will be discussed, counsel separated this motion into arguments relating to his motion for new trial and his motion for post-verdict judgment of acquittal.

[8] At that time, the State entered a *nolle prosequi* in case numbers 19-2124, 19-3354, 20-5130, and 21-3211.

[9] The original sentencing minute entry from December 6, 2021 was corrected by a *Nunc Pro Tunc* minute entry on December 8, 2021, with respect to correcting the trial court's recommendation to reflect only "self-help programs."

a written "Motion to Reconsider Sentence."[10] That same day, defendant filed a "Motion to Appeal Conviction and Sentence," which was granted by the trial court on December 15, 2021. Defendant now appeals, asserting five assignments of error.[11]

## FACTS

On March 14, 2018, Kerwin Connor (a/k/a "Puddy") was shot three times while outside of his residence in the 300 block of Clemson Place in Kenner, Louisiana.[12] After Mr. Connor was transported to the hospital, he died of his injuries.[13]

Denise Nelson, a neighbor, testified on March 14, 2018, she was with a "little boy" outside of her home at 318 Clemson Place. Ms. Nelson testified that she saw Mr. Connor arguing and "fussing" and that she told him to stop.[14] She recalled that she grabbed Mr. Connor by his shirt because he was close to her. She testified that she was in her parking spot by her apartment and that this was located

---

[10] *See* Errors Patent Review regarding the written motion to reconsider sentence.

[11] On November 29, 2022, defendant filed a "Motion for Leave to File *Pro Se* Supplemental Appeal Brief on the Merits." This Court granted the motion on December 1, 2022. On December 29, 2022, defendant filed a "Motion for Extension of Time to File *Pro Se* Supplemental Brief," which this Court granted on January 9, 2023, giving defendant until Friday, January 20, 2023 to file a *pro se* supplemental brief. A *pro se* brief was not filed by the January 20, 2023 due date. On February 27, 2023, defendant filed a "Motion to Enforce" in this Court, again seeking leave to file a supplemental brief in this appeal, which motion was denied by this Court as having been untimely filed, citing Uniform Rules–Courts of Appeal, Rule 2-12.8, which provides, in pertinent part: "An extension of time within which to file the brief maybe granted by the court for good cause shown on written motion filed with the clerk of the court on or before the date the brief was due."

[12] It is noted that multiple witnesses used Mr. Connor's nickname of "Puddy" and referred to him by this name throughout their testimony. In addition, it is noted that the street is referred to by differing names throughout the record. The street will be referred to as "Clemson Place" in this opinion.

[13] Multiple calls were placed to 9-1-1 reporting gunshots fired near apartment complexes located in the 300 block of Clemson Place. The parties stipulated that State's Exhibit 1 is an authentic and accurate recording of 9-1-1 calls made under Kenner Police Department, Item No. C80816-18. The parties also stipulated that State's Exhibit 2 is an authentic and accurate CAD printout generated in the same item number. Multiple 9-1-1 recordings reporting the incident were played for the jury.

[14] Ms. Nelson indicated that she knew Mr. Connor, who was a friend of her grandson. She did not know the person who was arrested in relation to the instant case; however, she knew his girlfriend and her family. She confirmed that she did not want to be involved in this homicide investigation.

on the same side of the street as Mr. Connor. Ms. Nelson denied seeing Mr. Connor with a gun at that time. When asked if she saw the person Mr. Connor was arguing with, she said that she could see "a person." She denied that she saw Mr. Connor approach that person or point a gun at that person. When asked if "that person" had a gun, Ms. Nelson answered, "No, not for me to see." She confirmed that she heard gunshots while she was on the "pave walk" by her house. She recalled that she heard gunfire and that Mr. Connor's back was to her. She grabbed the boy, got underneath a truck, and heard five more gunshots. She indicated that she saw Mr. Connor again by his door. She denied seeing the "other person" again that day or seeing anyone firing a gun that day. She did not remember telling a detective that she saw someone shoot Mr. Connor. She asserted that she only saw him running and a person running behind him.[15]

Malyssa Acevado Connor testified that she met Mr. Connor in 2007, and they were in a relationship for eleven and one-half years. In 2018, she lived in an apartment located at 308 Clemson Place with Mr. Connor and their daughter, K.C.[16] On March 14, 2018, she walked K.C. to the bus stop for school prior to going to work until 4:10 p.m. After returning home that evening, she showered and lay down on the couch. She recalled that K.C. played a videogame in the living room and that Mr. Connor went outside to work on his truck, which was parked in the field directly across the street. At some point, Mr. Connor came back inside the apartment, went upstairs, and left again. She was not aware of any altercation taking place outside at this time. Ms. Connor heard a "loud bang" from

---

[15] When asked if she recalled telling a detective and the prosecutor that she saw someone shooting at Mr. Connor that day, Ms. Nelson answered, "I remember telling you I saw running, [Mr. Connor] and another person under a car. Who he was I don't know." She then said that Mr. Connor "was running. And a person was running behind him. That's it, what I saw."

[16] Ms. Connor indicated that K.C. was born on August 27, 2008.

outside. She testified that K.C. climbed on top of the deep freezer, which was located near a window, looked outside, and started screaming.

Ms. Connor then jumped up and opened her door about three or four inches, but closed it after hearing a gunshot. She stated that she felt a "vibration in [her] chest" and knew "he" was on the other side of the door. She testified that she heard three gunshots. She recounted that Mr. Connor "fell through the door" and his friend Kevin was with him. Mr. Connor told her, "He shot me call 9-1-1," and he fell on the sofa and rolled on the floor. When she went outside with K.C., she saw a silver revolver outside of the door, and they jumped over it. Ms. Connor explained that she did not know that it was Mr. Connor's gun at that time. She believed he had previously gotten rid of a similar gun that he owned. After she called 9-1-1, EMS came to the scene and took Mr. Connor, who was shot in the legs, to University Hospital, where he died. She testified that it took a long time for the ambulance to arrive because of traffic. She said that Mr. Connor coded about five minutes from the hospital.

Ms. Connor testified that she provided a recorded statement to the lead investigator in this case. She admitted that she did not initially tell the detective about the silver gun she saw outside their apartment. When she brought K.C. to her interview at the CAC, Ms. Connor told the detective that she did not touch the gun. She further told him that she did not know to whom it belonged. She testified that the gun was gone when the police arrived on the scene. She denied knowing the identity of the "the other guy" that was with Mr. Connor in the truck across the street. She also informed the detective of her discovery of a bullet hole in the mop near her front door. Additionally, Ms. Connor testified that she received information regarding the identity of the shooter from someone in the neighborhood. This person sent Ms. Connor photographs from Instagram, which she provided to the lead detective. She also showed these photographs to K.C.

K.C., who was thirteen years old at the time of trial, stated that she was present the day that her father, Mr. Connor, died. She was nine years old and living with her parents on Clemson Place at that time. She testified that before hearing the gunshots, her father ran upstairs and then ran back outside. She did not remember if he had anything with him or in his hands that day. K.C. detailed that she was in the living room when she heard gunshots. She then jumped on the deep freezer to look out of the window. She detailed that she saw a man chasing her father with a gun across the street, where his truck and a field were located. She screamed and told her mom about what she saw. Her father then came inside and told her mom to call 9-1-1 because he was shot. K.C. indicated that she was brought to a friend's house. She confirmed that her mom showed her a photograph, where she recognized the man that was chasing her father. Also, K.C. confirmed that she previously told the prosecutor that she saw her father with a gun. She clarified that she did not remember if he had a gun. She indicated that she saw the gun in the house. She did not know if it was her father's gun.

While working as a forensic interviewer with the Jefferson CAC, Brittney Bergeron Millet conducted a forensic interview of K.C. in March 2018. She identified State's Exhibit 13 as a video recording of that interview. The video was admitted into evidence and was later played for the jury. K.C.'s CAC interview was very similar to her trial testimony regarding the shooting.

K.C. told Ms. Millet that on the day of the shooting, her father, Mr. Connor, was working on his truck outside and talking with some friends. She explained that she knew this because she looked out of the window to see if her father was "okay." While she was in the living room, she heard gunshots and went to look out of the window. K.C. explained that she saw her father running and someone chasing him with a gun. She stated that her father was in front of the man and he was trying to "dodge." She indicated that the man was "running in the same way,"

but he was not trying to "dodge." K.C. stated that she saw the man fire by the landlord's office. Later, she clarified that she did not see when her father was shot. She explained that she saw the man "firing," but she did not think it hit her father. K.C. provided that she became scared, jumped off the freezer, and told her mom what she saw. She remembered that her father came inside and told her mom to call 9-1-1 because he had been shot. She also remembered seeing her father's friend, Kevin. K.C. explained that she saw blood coming from her father's legs because he had his pants pulled up.

During her interview with Ms. Millet, K.C. described the man who was chasing her father. She indicated that he had skin darker than her father's, he wore jeans and tennis shoes, and he had short, dark brown dreadlocks. She did not know his name and had not seen him before. Additionally, K.C. stated that her mom showed her a picture from Instagram of the "man [she] thought killed her dad." She told Ms. Millet that she was seventy percent sure that it was the same man as the one she saw chasing her father. K.C. described the man in the photograph as having short dreadlocks, darker skin than her own, and wearing jeans and a blue shirt. K.C. estimated that the man in the picture was seventeen or eighteen years old.

Dr. Dana Troxclair with the Jefferson Parish Coroner's Office qualified as an expert in the field of forensic pathology.[17] Dr. Troxclair testified that she performed an autopsy on Mr. Connor. She explained that he had three gunshot wounds. The first gunshot wound entered the anterior left thigh and it exited the media upper left thigh, perforating the left femoral artery. She indicated that the second gunshot went through his mid-left thigh and exited the posterior lower left thigh and only perforated the skin and muscles. The third gunshot entered his mid-

_____

[17] The parties stipulated that Dr. Troxclair qualified as an expert in the field of forensic pathology.

right thigh and exited the posterior upper right thigh, perforating the right femoral artery. She testified that the distant gunshot wounds were fired from at least two to three feet away.[18]

Dr. Troxclair opined that these gunshot wounds would not have been fatal if Mr. Conner had received prompt medical treatment.[19] She confirmed that Mr. Connor went into cardiac arrest about fifty minutes after he was injured and about five minutes from the hospital. Additionally, she provided that the toxicology report reflected morphine and marijuana in Mr. Connor's blood, and morphine, codeine, caffeine, and nicotine in his urine. She indicated that the combination of morphine and codeine present indicated the recent use of heroin. She testified that Mr. Connor's cause of death was multiple gunshot wounds and that his manner of death was homicide.

Martha Maize testified that she heard gunshots while she lived in an apartment at 301 Clemson Place. She explained that after the shooting, a tall male with dreadlocks went to an apartment, which was located across the street from her apartment. She confirmed that the individual she saw with the gun was her neighbor. She indicated that she saw him put the gun inside of a backpack as he walked through the gate. He then went inside his apartment, his girlfriend came outside, and they later went to the back of the apartments.

After learning that the shooter might have gone to 301 Clemson Place, Apartment 110, officers obtained a search warrant for that apartment.[20] Upon

---

[18] Dr. Troxclair noted that gunshot wounds one and three entered the front of Mr. Connor's thighs. She agreed that this could be consistent with someone being shot facing the person firing the gun. She pointed out that the exit wound for gunshot three was higher up on the thigh and his leg would have to be bent if the perpetrator was in front of him. She also confirmed that it could be consistent with an individual running toward a person who was firing a gun.

[19] Dr. Troxclair further confirmed that if a tourniquet would have been applied correctly and quickly, Mr. Connor could have survived. In her opinion, it was not possible to sustain two severed arteries and run 175 yards.

[20] Detective Brandon Davis testified that he was dispatched to the 300 block of Clemson Place regarding a shooting. Upon his arrival at the scene, he spoke with possible witnesses. He

contacting the apartment manager, it was discovered that defendant and Darriyell Beasley were the occupants. In the meantime, Louisa Lockarno informed the officers that she provided defendant and Ms. Beasley with a ride that day.

Ms. Lockarno indicated that she was living at 249 Clemson Place, Apartment 410, on the day of shooting. Her neighbor, Ms. Beasley, whom she knew from work, lived with her boyfriend in the apartment complex directly behind her own. She also knew Mr. Connor from the neighborhood. That afternoon, after seeing Ms. Beasley, she agreed to give her and her boyfriend a ride to his relative's residence. She recalled that defendant approached them from the back area of their apartment complex.[21] She recalled that the street was closed off, and police were present. Before leaving the parking lot, Ms. Beasley took off her Vincent Guard jacket and climbed in the back with defendant. She told Ms. Lockarno that she did not want to see "a man" because they owed him money. When she dropped them off, Ms. Beasley left her jacket and phone inside the vehicle. After learning of Ms. Beasley's involvement in a shooting, Ms. Lockarno contacted the police and told them about the items left inside her vehicle. She gave consent for the police to search her car and to obtain a buccal swab.

Darriyell Beasley testified at trial and stated that defendant is her boyfriend and the father of her two-year-old daughter. Ms. Beasley testified that in March of 2018, she was living with defendant in Apartment 110 on Clemson Place. She explained that on March 14, 2018, at around 4:00 or 5:00 p.m., she left her apartment to walk to the store. On her way, she passed in front of a vacant lot located on the side of her apartment complex. Mr. Connor was present with "one guy." She heard him say something to her, but could not understand what he said.

___

learned that the shooter might have gone to this location, and he established a perimeter in the area.

[21] Ms. Lockarno explained that there was an alley in the back of the complex.

She testified that she did not feel threatened at that time. Defendant met up with her on her way back from the store. She told defendant about what occurred as they passed Mr. Connor's truck. Ms. Beasley asserted that Mr. Connor and defendant had a verbal altercation.

Ms. Beasley testified that Mr. Connor was upset and belligerent. She denied that he had a gun at that time. She told defendant that they did not want to cause problems since they had only lived in the area for six months. They then returned to their apartment. She believed Mr. Connor wanted to start a fight. She denied that he hit or swung at defendant. She also denied that defendant told her that Mr. Connor had a gun or that he felt threatened at that time. She recalled Mr. Connor said, "I'm going to put on my shoes" before he ran home. She thought that Mr. Connor went inside and would "chill out" and that the incident was over.

After returning to their apartment, she and defendant wanted to take their dog for a walk at the park. Ms. Beasley testified that defendant armed himself with a gun because they did not know "what [they] were going back outside to."[22] She asserted that when she left her apartment, she saw Mr. Connor holding something in his hand, but she did not think it was a gun. She explained that they did not make it out of the apartment complex because Mr. Connor met them near the dumpster. She testified that as Mr. Connor pointed a gun at them, she screamed, and ran back toward the stairs.[23] Ms. Beasley stated that Mr. Connor told defendant that he was going to make him use his gun. She said that she could hear because she was not far from them. She denied that she saw defendant raise his

---

[22] Ms. Beasley identified State's Exhibit 14 as a photograph of a gun that looked like defendant's gun.

[23] Ms. Beasley denied initially telling Detective Nick Englar that she did not believe Mr. Connor was going to pull the trigger. She also did not remember telling the detective that she thought Mr. Connor was "just fake stunting." After being shown the transcript of her statement, she denied telling the detective that she did not think Mr. Connor would pull the trigger. A portion of the audio recording of Ms. Beasley's first statement was played, and she recognized her voice on the recording. Ms. Beasley then recalled that she told the detective this information.

weapon to fire. She heard gunshots, and she stayed on the stairs until defendant returned to the apartment.[24]

Ms. Beasley testified that after the shooting, they left the area because they were afraid. They received a ride from her neighbor, Ms. Lockarno, and were taken to defendant's relative's house on Idaho Avenue. Ms. Beasley and her cousin dropped defendant off at his brother's house in Houma, Louisiana. She indicated that Ariel Evans, who was the daughter of defendant's brother, also lived at this address. The next day, she went to retrieve her cell phone and was detained by the police. She stated that the detectives tried to tell her that Mr. Connor did not have a gun. She stated that defendant was not arrested until seven months later. She admitted to contacting him on a phone application and sending him items like money, clothing, and food. Ms. Beasley confirmed that she pled guilty to the charge of accessory after the fact to second degree murder and received three years of probation. She asserted that she did not plead guilty in exchange for testifying. She explained that she did it because she was pregnant with her daughter.[25]

During this investigation, a search of the area was conducted based on the information received from Ms. Lockarno. Lieutenant George Hoffman of the

---

[24] During her testimony, Ms. Beasley discussed the surveillance video from that day (State's Exhibit 11). She asserted that it was "not how it went." She confirmed that in the video, after the first confrontation, she and defendant could be seen going "around the corner toward [their] apartment." When asked if she saw any more figures in the video go around that corner, Ms. Beasley answered, "No. He came by the dumpster. They have two big dumpsters that sit on both sides in the front of the apartment and they have a gate there too." Thereafter, Ms. Beasley identified photographs depicting the front area of her apartment. These photographs were admitted into evidence. She confirmed that the area where the dumpsters were located could not be seen in the video. She further confirmed that the backside of her apartment building can be seen in the video. She agreed that defendant could be seen chasing Mr. Connor down the street in the video.

[25] Ms. Beasley identified State's Exhibit 18 as a photograph of defendant and their dog. She identified State's Exhibit 19 as a photograph of her and defendant walking back from the store together. She also identified State's Exhibit 20 as a photograph of Mr. Connor with a gun in his hand. She recalled Detective Englar showing her a still photograph (State's Exhibit 21). She testified that she told the detective that she would not be able to identify him because both of them had dreadlocks and wore dark clothing. Ms. Beasley testified that defendant was inside of the apartment for about ten to fifteen minutes; however, she agreed that defendant was not inside for that length of time based on the video.

Kenner Police Department testified that he found a handgun located inside an open potato chip bag in the rear of the apartment complex located at 249 Clemson Place.[26]

Nhung Mai, a Kenner Police Department crime scene technician, processed the scene. She identified numerous photographs taken from the crime scene and of the victim. She collected a firearm located on the scene, a jacket and cell phone from a vehicle, and swabs from these items for DNA analysis. She obtained reference samples from Ms. Lockarno and Ms. Beasley. She also identified ballistic evidence collected from the scene in the 300 block of Clemson Place.

Ms. Mai collected spent casings from 308 Clemson Place, Apartment A; casings at the corner and front of the apartment complex where 308 Clemson Place is located; a spent casing located between two red flip flops; spent casings from the road that ran perpendicular to Clemson Place; and casings and a projectile jacket located by a vehicle. She also identified a projectile found in the north side bedroom of Apartment 12, and a spent casing obtained at 500 Veterans from a detective. Additionally, she testified that an apartment building in the area sustained damage from the gunfire. She indicated that bullet holes were found in apartments A-12, A-13, and A-14 in one of the complexes. She pointed out that a security camera with a bullet hole could be seen outside of this apartment building. She explained that this directly aligned with the bullet holes found inside the three apartments.

Detective Nick Englar, who was the lead detective in the instant case, testified that other officers canvassed the scene during the investigation. They discovered several apartments with projectile damage at another apartment complex called LaBelle Maison, located at 341 Clemson Place. After contacting

---

[26] Lieutenant Hoffman denied seeing a gun located on the front porch at 308 Clemson Place, where the injured individual was located.

the property manager, officers documented the damage, collected evidence, and retrieved surveillance video from this complex. Detective Englar reviewed the surveillance video from 341 Clemson Place.[27] The video was played for the jury.

Detective Englar stated that the video showed the 300 block of Clemson Place. He pointed out the empty lot where Mr. Connor was sitting inside his vehicle. He further pointed out the location of defendant's apartment at 301 Clemson Place. In the video, Detective Englar confirmed that Ms. Beasley, who was wearing a Vincent Guard jacket, could be seen walking towards the gas station on the corner of Clemson and Loyola. He described defendant, who was wearing a backpack, walking a dog and moving in the same area. He testified that defendant, Ms. Beasley, and their dog can be seen returning in the direction of their apartment. He said that Ms. Beasley appeared to be talking to defendant and "gesturing up the street." Defendant and Ms. Beasley were approached by an individual who was identified as Mr. Connor. He stated that Mr. Connor can then be seen jogging across Clemson Place and entering his apartment. Defendant and Ms. Beasley move out of the camera frame near their building. The detective testified that Mr. Connor paces back and forth and that two individuals, who he believed are Kevin Brown and Bernell Tibbit, arrive.[28]

Detective Englar said that in another view, Mr. Connor could be seen returning from his apartment. He said that he appears to be located by the cars on the left. He also indicated that another figure is moving back toward Clemson Place. He testified that Mr. Connor could be seen moving back and forth and that

---

[27] Detective Englar explained that in preparation for trial, he reviewed a compilation of the different camera angles in order to "piece together all of the angles" that showed the incident.

[28] The detective explained that no firearm consistent with the revolver seen in the video was found. Based on his investigation, Detective Englar believed that Mr. Tibbit or Mr. Brown moved Mr. Connor's firearm. He confirmed that they did not search the residence of Mr. Brown or Mr. Tibbit. They also did not search Mr. Connor's truck for the gun. He testified that Mr. Brown and Mr. Tibbit denied having knowledge of Mr. Connor's gun. Detective Englar testified that he did not have any direct evidence that they took the gun. He was unable to make contact with Mr. Brown again or locate Mr. Tibbitt.

another figure is moving just above a white car or a truck in the video. He testified that people could be seen ducking and running, which was likely when the gunshots started. The detective said that Mr. Connor jumped over a trailer and was chased by the person, who was identified as defendant. He mentioned that in the video, Mr. Connor appears to be armed with a revolver, and defendant has a semi-automatic handgun. He said that this was consistent with the Glock handgun discovered behind the apartments. After Mr. Connor turns the corner by his apartment, defendant stopped and went in the direction of his apartment.

The detective explained that similar items seen in the surveillance video were seized from defendant's apartment, including a Louis Vuitton Bag and shoes. He recalled that defendant was not found at the apartment or the location provided by Ms. Lockarno. He indicated that surveillance video was also obtained from Idaho Avenue, which showed Ms. Lockarno in her vehicle dropping off defendant and Ms. Beasley.[29] He stated that thirty minutes after the 9-1-1 call, they could be seen walking their dog and having a discussion.[30]

On the day following the murder, Detective Englar received another call from Ms. Lockarno advising that Ms. Beasley had returned. He located Ms. Beasley, placed her under arrest, and took her to the Kenner Police Department. She was interviewed after being advised of her rights. He also obtained her consent for a buccal swab, as well as a search of her cellphone.[31] He confirmed that he received an arrest warrant for defendant, but that he was not located and arrested until nearly seven months later on October 11, 2018. After seeing

_____

[29] Sergeant Edward Rohde worked in the crime scene division of the Kenner Police Department in March 2018. Sergeant Rohde assisted in this case by checking for surveillance cameras in the "2500 or 2600 block of Idaho." He explained that he recovered surveillance video which showed 2504 Idaho Avenue and 2542 Williams Boulevard. This video was admitted into evidence. The video was played for the jury.

[30] Detective Englar confirmed that he interviewed Ms. Beasley several times. He relayed that she denied having any sort of conversations about the shooting with defendant.

[31] Detective Englar testified that a search of her cell phone revealed nothing of relevance to the investigation at that time.

photographs of Ms. Beasley and defendant together on Instagram, Detective Englar conducted surveillance on her residence. She was detained, after which he spoke with her again. He relayed that Ms. Beasley admitted to aiding defendant and meeting with him on several occasions. He then arrested her for accessory after the fact to second degree murder, after which her jail calls were monitored.[32]

After searching Ms. Beasley's phone, Detective Englar saw a reference to an address at 2683 Express Boulevard in Houma, Louisiana. Defendant was subsequently located by U.S. Marshals at that location and was arrested.[33] During a search of the residence, two cell phones were seized, and they showed conversations consistent with ones seen on Ms. Beasley's phone.[34] Detective Englar indicated that defendant and Ms. Beasley were both arrested on October 11, 2018. The detective testified that although defendant was initially uncooperative, he provided a statement after being advised of his rights.[35] A buccal swab was also obtained from defendant.

Detective Englar further testified that he interviewed Mr. Connor's fiancée. He also monitored the interview of K.C. at the CAC from a different room. He explained that Ms. Connor did not tell him about the gun she saw that day, and he

---

[32] Detective Englar confirmed that after Ms. Beasley contacted Sarah Calderon, he met with Ms. Calderon. She provided him with information about the use of a CashApp to provide defendant with money. She told the detective that this was how Ms. Beasley was providing defendant with money.

[33] Matthew Glapion with the Kenner Police Department testified that he was on the U.S. Marshals Fugitive Force. Approximately six or seven months after the homicide, Mr. Glapion went to the possible location of defendant at 2638 Express Boulevard in Houma, Louisiana. Once he knocked on the door, Mr. Glapion heard what sounded like someone trying to hide inside. He stated that defendant gave himself up, and they took him into custody. He confirmed that Detective Englar executed a search warrant at the location afterwards. Also, Sergeant Rohde examined the cell phones seized in connection with the instant case. He generated extraction reports for all of the phones.

[34] Officer Charles Dionne, a crime scene and digital forensic technician formerly with the Kenner Police Department, testified that he participated in the execution of a search warrant for the residence located at 2683 Express Boulevard on October 20, 2018. He also testified as to the evidence seized from the house and a surveillance video obtained from the Dollar General store in Houma.

[35] The statement was transcribed, and a copy was admitted into evidence as State's Exhibit 90. The recording was admitted into evidence as State's Exhibit 91 and was published to the jury.

did not learn of Mr. Connor's gun until his interview with Ms. Beasley. Detective Englar confirmed that he obtained search warrants for the EMS and University Medical Center medical records for Mr. Connor. He explained that the records showed Mr. Connor was incoherent when EMS arrived at the scene.

Emily Terrebonne of the Jefferson Parish Sheriff's Office Crime Laboratory was accepted as an expert in firearms and toolmark examination. Ms. Terrebonne stated that she analyzed the ballistic evidence from the scene in the instant case and prepared a report. She identified several 9 mm fired cartridge cases, copper jackets and projectiles, two unfired 9 mm cartridges, and a Glock handgun. She stated that the cartridge casings were fired from the Glock handgun she analyzed. She could not determine if the recovered projectiles were fired from the Glock handgun. She stated that they were consistent with the same type of gun. Ms. Terrebonne further identified two photographs that she examined in this case. [36] She asserted that the firearm in State's Exhibit 51 was consistent with a semi-automatic weapon based on its shape and the way that it is being held. She testified that the firearm in State's Exhibit 52 was more consistent with a revolver based on its overall shape and the way it was being held. She denied that any of the recovered projectiles were consistent with being fired from a revolver.[37]

Satara Shiwani, a forensic DNA analysist with Jefferson Parish Sheriff's Office, received evidence and buccal swabs from individuals in this case to analyze. She testified that Ms. Lockarno was excluded as a contributor, and defendant was excluded as a major contributor to the DNA profile obtained from the Glock handgun and magazine. Due to the complexity of the mixture, the

---

[36] State's Exhibits 51 and 52, the photographs Ms. Terrebonne viewed, appear to be still images of the individuals seen in the surveillance video footage.

[37] Ms. Terrebonne explained that the JPSO crime lab no longer conducted gunshot residue testing on a homicide victim's hands because it is not a reliable indicator of whether or not that person fired a weapon.

contributor status of Ms. Beasley and the minor contributor status could not be determined. She stated that Ms. Beasley was excluded from the DNA profile obtained from the swab of the rear driver-side interior door handle. It was determined that the DNA profile was uninterpretable for inclusionary purposes. She indicated that defendant was excluded as a contributor to the DNA mixture obtained from the swab of the rear passenger-side interior door handle. She provided that no conclusion could be made regarding the contributor status of Ms. Lockarno and Ms. Beasley.

Jennifer Bracamontes, a DNA analyst at Cybergenetics, qualified as an expert in forensic DNA analysis. She was able to further analyze the DNA mixtures from the swabs taken from the interior car doors and the Glock handgun in the instant case. The conclusions showed that a match between the swab from the Glock handgun and defendant was 118 trillion times more probable than a coincidental match to an unrelated African American person; the match was 10.6 quadrillion times more probable than a coincidental match to an unrelated Caucasian; the match was 7.23 quadrillion times more probable than a coincidental match to an unrelated Southeast Hispanic person; and the match was 20.8 quadrillion times more probable than a coincidental match to an unrelated Southwest Hispanic Person.[38] She also found an inclusionary match statistic between the Glock handgun and Ms. Beasley that was 238 times more probable than a coincidence.

Defendant did not testify in this matter. He did provide a statement to Detective Englar upon his arrest, which was audio recorded and transcribed. The

---

[38] Ms. Bracamontes explained that the matched statistic to defendant had a strength of 118 trillion and only "1 in quadrillion people would match as strongly." She testified that one would have to "go through 110 quadrillion people before you'd expect to find somebody that would have that match statistic again." The transcript reflects that she stated unrelated Southeast Hispanic person twice. A review of the report showed the results for an unrelated Southeast and Southwest Hispanic person.

audio recording was played for the jury. Defendant provided the following in his statement to Detective Englar.[39] In March 2018, the victim approached him and Ms. Beasley in the lot next to their apartment. He recalled that he asked Ms. Beasley to go to the store for a "gar" on that day. Defendant caught up with her at the store. He explained that on the way back to their apartment, he greeted a "dude" that was with the victim. He provided that the victim addressed him on "some hype sh*t like on some fight sh*t." He told Detective Englar that he walked off because he did not want to escalate the situation. He also explained that when they spoke, the victim jumped out of the car and said, "what's up, what's up? What you wanna do then? What's up? What's up?" Defendant responded "what you want to do?" He recalled that the victim was "throwing his set up on some sh*t like what's up, what's up like he wanna fight[.]" Also, defendant told the victim that he was a joke and a "dope head" in front of people. Defendant thought that might have caused him to get his gun.

Defendant stated that he walked off and went inside to "chill." He then decided that he was going to go to the park. He recalled that as he walked out of his driveway, he saw the victim approaching him with a gun. Defendant described that he was in shock and could not run. He asserted that the victim was on some "sh*t like 'f*ck what you talking about I'm about to make you use that b*tch. Eh you ain't cheah all that, all this sh*t you saying sh*t like you ain't out cheah. F*ck that I'm about to make you use that b*tch." Defendant provided that the victim pointed his gun towards him. He stated that when the victim lifted his gun, defendant "went to shooting at, at him with my sh*t."

Defendant stated that he knew the victim was "on something" because he skipped toward defendant. He said that the victim scared him when he saw the

_____

[39] Defendant did not refer to Mr. Connor by his name during his statement. It appears he was referring to the victim.

gun. He explained, "To the point where I just had to defend myself, that, that how it was, I was scared for my life when he approached me with that b*tch. Then he talking about he was going to make me use my gun, I ain't even think I was going to get the chance to use my gun." Defendant confirmed that his gun was in his Louis Vuitton bag at that time.

Additionally, defendant asserted that he ran behind the victim because he pointed his gun at defendant. He alleged that when the victim ran behind a car, he was still pointing his gun like he was going to get "shot off on [him]." He stated, "I'm, I was in rage I ain't going to lie like I wasn't, I was, I was no longer in the right state of mind no more." Defendant did not think that the victim had a revolver, which he referred to as a "shell catcher." He asserted that the victim shot eight times. Once the victim ran in the direction of people, defendant stopped shooting. He felt like the victim hit "something if anything." Defendant told the detective that he felt like "he took me like took, trying to (UNI) on me like I was little boy." Also, he explained that Ms. Beasley ran and was not present when the shooting occurred. He stated that he stashed his gun, which he described as a "Glock with a 9 caliber." Defendant said that after the shooting, he and Ms. Beasley were dropped off at his mother's house on Idaho. He then used Lyft or Uber to reach Houma. He claimed that it was self-defense and that he ran to get money together for a lawyer.[40]

---

[40] Detective Englar also testified about defendant's statement. He confirmed that defendant said that they were about to go inside, but instead said they were going to the park. He explained that this is inconsistent with what Ms. Beasley told him about going inside the apartment. He also pointed out that defendant did not believe Mr. Connor's weapon was a revolver, but was a semi-automatic. Detective Englar indicated that defendant told him that he felt like Mr. Connor hit something and implied that he shot. The detective explained that he did not find any damage in the direction of defendant's apartment. He confirmed that defendant claimed he stopped chasing Mr. Connor when he started ducking in the cars. Detective Englar testified that this was not consistent with the video.

# ASSIGNMENT OF ERROR NUMBER TWO[41]

## *Sufficiency of the evidence*

By this assignment of error, defendant alleges that there was insufficient evidence to support his conviction for second degree murder, as the State failed to prove beyond a reasonable doubt that the killing was not committed in self-defense or did not constitute manslaughter. He notes in brief that he raised these same arguments in a motion for post-verdict judgment of acquittal. Defendant contends the facts of trial showed that he was enraged by the aggression and provocation of Mr. Connor, who insulted defendant's girlfriend, started a verbal altercation with him, retrieved his gun, and waited for defendant and his girlfriend outside of their home. He asserts that there was no evidence that he had time for his "blood to cool." Therefore, he argues that the evidence supports the lesser-included offense of manslaughter. Defendant also asserts that the killing was done in self-defense and that Mr. Connor was the initial aggressor twice.

The State responds that it presented sufficient evidence to support a conviction for second degree murder. The State submits that the surveillance video did not clearly capture what occurred during the initial part of defendant and the victim's interaction. The State provides that defendant and Ms. Beasley asserted that the victim pulled his gun first and caused them to feel threatened. The State provides that defendant claimed the victim said he was going to make defendant use his gun. The State points out that defendant alleged his weapon was

---

[41] When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, such as the erroneous admission of evidence, the reviewing court should first determine the sufficiency of the evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992); *State v. Mayeux*, 94-105 (La. App. 5 Cir. 6/28/94), 639 So.2d 828, 834. If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds that the totality of the evidence was sufficient to support the defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the trial court's error requires a reversal of the conviction or was harmless. *State v. Alexis*, 98-1145 (La. App. 5 Cir. 6/1/99), 738 So.2d 57, 64, *writ denied*, 99-1937 (La. 10/13/00), 770 So.2d 339.

concealed. Thus, the State contends that the jury could have reasonably inferred that defendant must have already threatened the victim with the gun at some point.

Additionally, regardless of whether Mr. Connor was the initial aggressor, the State asserts that the verdict of second degree murder was warranted. The State maintains that the facts of this case do not fit the requirements of a manslaughter conviction. The State points out that Ms. Beasley did not believe Mr. Connor was going to pull the trigger, that Mr. Connor said he was going to make defendant use the gun, and that defendant referenced Mr. Connor trying to make him feel like a "little boy." The State avers that defendant chased Mr. Connor, discharged his gun fourteen times, and mortally wounded the victim on his own doorstep. The State contends that defendant's killing of Mr. Connor was an irrational response to a threat to his masculinity and reputation rather than safety. Accordingly, the State maintains the defense did not prove the mitigatory factors by a preponderance of the evidence in order to be entitled to the lesser verdict of manslaughter.

Similarly, the State asserts that defendant's self-defense argument fails. The State argues that under the circumstances, defendant could not have reasonably believed that he was in imminent danger of losing his life. The State specifically mentions that no evidence showed that Mr. Connor fired his weapon that day, he disengaged from the encounter, and the surveillance video showed him fleeing. The State asserts that defendant's actions following the shooting were inconsistent with a defense of justification.

On December 6, 2021, defense counsel filed a "Motion for New Trial and Motion for Post Verdict Judgment of Acquittal." In the motion for post-verdict judgment of acquittal, he argued that the evidence was insufficient to support the conviction of second degree murder and that manslaughter was the more appropriate verdict. He further asserted that the State did not eliminate the reasonable possibility that he acted in self-defense. At the hearing, defense

counsel raised similar arguments, to which the State responded that there was ample evidence presented for the jury to convict defendant of second degree murder.  The trial court denied defendant's motion for post-verdict judgment of acquittal.

The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821.  *State v. Mouton*, 16-673 (La. App. 5 Cir. 4/26/17), 219 So.3d 1244, 1254, *writ denied*, 17-1149 (La. 5/18/18), 242 So.3d 572; *State v. Bazley*, 09-358 (La. App. 5 Cir. 1/11/11), 60 So.3d 7, 18, *writ denied*, 11-282 (La. 6/17/11), 63 So.3d 1039.  A post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty.  *State v. Durand*, 07-4 (La. App. 5 Cir. 6/26/07), 963 So.2d 1028, 1033, *writ denied*, 07-1545 (La. 1/25/08), 973 So.2d 753.  An appellate review of the denial of the motion for post-verdict judgment of acquittal is controlled by the standards set forth in *Jackson v. Virginia*, *infra*.  *See State v. Trice*, 14-636 (La. App. 5 Cir. 12/16/14), 167 So.3d 89, 92.

In reviewing the sufficiency of the evidence, an appellate court must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804.

The directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing.  *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702.  This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or

whether the conviction is contrary to the weight of the evidence.  *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 2/5/10), 27 So.3d 297.  As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at the trial established guilt beyond a reasonable doubt, but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt.  *State v. McKinney*, 20-19 (La. App. 5 Cir. 11/4/20), 304 So.3d 1097, 1103.

In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence.  *Caffrey*, *supra*.  Indeed, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness.  *State v. Bailey*, 04-85 (La. App. 5 Cir. 5/26/04), 875 So.2d 949, 955, *writ denied*, 04-1605 (La. 11/15/04), 887 So.2d 476, *cert. denied*, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005).  Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction.  *State v. McKinney*, 304 So.3d at 1103 (citing to *State v. Dixon*, 07-915 (La. App. 5 Cir. 3/11/08), 982 So.2d 146, 153, *writ denied sub nom.*, *State ex rel. Dixon v. State*, 08-987 (La. 1/30/09), 999 So.2d 745).

Evidence may be either direct or circumstantial.  Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience.  *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1034 (citing to *State v. Williams*, 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833).  When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that assuming every fact to be proved that the evidence tends to

prove, "in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Wooten*, 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, *writ denied*, 99-2057 (La. 1/14/00), 753 So.2d 208. This is not a separate test from the *Jackson* standard, but rather provides a helpful basis for determining the existence of reasonable doubt. *Id.*

In this assignment of error, defendant challenges his conviction for the charge of second degree murder. La. R.S. 14:30.1 defines second degree murder as the killing of a human being when the offender: 1) has the specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm. *See State v. Lewis*, 05-170 (La. App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, *writ denied*, 06-757 (La. 12/15/06), 944 So.2d 1277. Here, the written jury charges, signed by the trial judge, reflect that the jury was informed that it could convict defendant under the theory that he had the specific intent to kill or inflict great bodily harm. The jury was instructed as to self-defense. They were also instructed that they could find defendant guilty of the responsive verdict of manslaughter.

Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from the circumstances and actions of the accused, as well as the extent and severity of the victim's injuries. *State v. Bone*, 12-34 (La. App. 5 Cir. 9/11/12), 107 So.3d 49, 58, *writ denied*, 12-2229 (La. 4/1/13), 110 So.3d 574. A defendant's act of aiming a lethal weapon and discharging it in the direction of his victim supports a finding by a trier of fact that the defendant acted with specific intent to kill. *See State v. Hidalgo*, 95-319 (La. App. 5 Cir. 1/17/96), 668 So.2d 1188, 1197.

Upon review, we find that the State presented sufficient evidence under the *Jackson* standard to establish the essential statutory elements of second degree murder. Here, we find that the State carried its burden of proving that defendant acted with specific intent to kill or inflict great bodily harm. Defendant admitted that he shot at Mr. Connor with a gun. It appears that the victim died from gunshots wounds to his legs that severed his femoral arteries in both legs. Additionally, surveillance video was played during the trial which captured the events on film from that day. Detective Englar indicated that defendant could be seen chasing Mr. Connor with a gun in this video. Testimony also established that numerous casings were recovered, which matched defendant's gun, from the scene that day. A defendant's act of aiming a lethal weapon and discharging it in the direction of his victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. *See Hidalgo*, *supra*.

Defendant does not deny that he shot and killed Mr. Connor, but rather contends that he acted in self-defense. When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Reed*, 11-507 (La. App. 5 Cir. 2/14/12), 88 So.3d 601, 607, *writ denied*, 12-644 (La. 9/14/12), 97 So.3d 1014. A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1). The fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18; *State v. Sparkman*, 13-640 (La. App. 5 Cir. 2/12/14), 136 So.3d 98, 106, *writ denied*, 14-477 (La. 11/26/14), 152 So.3d 897.

The person who is the aggressor or who brings on a difficulty cannot claim self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know his desire is to withdraw and discontinue the conflict. La. R.S. 14:21. In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. *State v. King*, 11-767 (La. App. 5 Cir. 2/28/12), 88 So.3d 1147, 1153, *writ denied*, 12-660 (La. 9/14/12), 99 So.3d 35.

Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Lensey*, 50,242 (La. App. 2 Cir. 11/18/15), 182 So.3d 1059, 1062, *writ denied*, 15-2344 (La. 3/14/16), 189 So.3d 1066. The determination of a defendant's culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. *State v. Sinceno*, 12-118 (La. App. 5 Cir. 7/31/12), 99 So.3d 712, 720, *writ denied sub nom.*, *State ex rel. Sinceno v. State*, 12-2024 (La. 1/25/13), 105 So.3d 713. The fact-finder determines whether the State negated self-defense beyond a reasonable doubt. *State v. Griffin*, 14-450 (La. App. 5 Cir. 12/16/14), 167 So.3d 31, 38, *writ denied*, 15-148 (La. 11/20/15), 180 So.3d 315.

In the instant case, the testimony and evidence at trial established that on the day of the shooting, Mr. Connor was working on his truck in the lot across the street from his apartment complex on Clemson Place and next to defendant's apartment complex. It was established that in the afternoon, around 4:00 p.m., Ms. Beasley left her apartment in order to walk to the store. On her way, she passed

Mr. Connor. Defendant eventually met up with Ms. Beasley, and they walked back to their apartment together. During their return, defendant and Mr. Connor had a verbal altercation. Ms. Beasley explained that Mr. Connor was upset and belligerent. She recounted that she felt like Mr. Connor wanted to start a fight, but that he did not hit or swing at defendant. She denied that Mr. Connor had a gun or that he threatened him at this time. Afterwards, Mr. Connor ran home, and she believed the incident was over. The testimony and evidence established that Mr. Connor returned to his apartment, went upstairs, and returned outside with a gun. Ms. Beasley also provided that before leaving their apartment to walk their dog at the park, defendant armed himself with a gun because they did know "what they were going back outside to." Mr. Connor was then chased by defendant until he reached his apartment. He sustained three gunshot wounds and later died from his injuries.

In this case, there were conflicting versions of the events surrounding the shooting. Ms. Nelson testified at trial that she saw Mr. Connor "arguing" the day of the shooting. She provided that he was so close to her that she could touch him. She recalled that she was standing in her parking spot near her apartment and that this was on the same side of the street as Mr. Connor. Ms. Nelson explained that she could see him arguing with "a person." She denied that Mr. Connor approached that person. She further denied that Mr. Connor pointed a gun at that person or that she saw that person with a gun. She recalled that she heard gunfire and heard additional gunshots after hiding underneath a truck. However, she did not remember telling officers that she saw the whole thing and that she saw someone shooting Mr. Connor. Ms. Nelson confirmed that she previously told the detective and the prosecutor that she saw Mr. Connor running and that she saw "a person" running behind him.

As discussed, Ms. Beasley explained that she thought the incident was over when Mr. Connor ran home, and they left their apartment again to walk their dog. She testified that defendant armed himself with a gun before leaving their apartment. According to Ms. Beasley, after entering the parking lot, she and defendant encountered Mr. Connor by a dumpster in front of their apartment complex, where he pointed a gun at them. She then screamed and ran back towards the stairs. She alleged that she heard Mr. Connor tell defendant that he was going to make him use the weapon. Also, she denied telling Detective Englar that she did not believe Mr. Connor was going to pull the trigger and that he was "just fake stunting." After being confronted with the audio recording of her statement, she agreed that she told the detective this statement. After viewing surveillance video from that day, Ms. Beasley denied that was "how it went." She asserted that Mr. Connor came by one of the dumpsters in her apartment. She then agreed that photographs, which showed the dumpster's location, reflected that they were located on the opposite side of the building. She confirmed that this was the side of the building that could not be seen in the video.

K.C. also provided that she heard gunshots, looked outside of the window, and saw a man chasing her father with a gun across the street. She elaborated in her forensic interview that her father was in front of this man and trying to dodge the bullets.

Additionally, the State presented the testimony of the lead detective, Detective Englar, who reviewed surveillance video from an apartment complex located at Clemson Place. At trial, it was played for the jury, and the detective narrated the events depicted in the video. He described that after Mr. Connor returned from his apartment, he can be seen pacing back and forth and that two other individuals arrive. He described that an individual can be seen by the cars and that another figure could be seen moving back toward Clemson Place. He also

confirmed that "two individuals come across with [Mr. Connor] and move across the left." He indicated that Mr. Connor could be seen moving back and forth in the street. He explained that in the video, Mr. Connor moves from the street towards the vehicles, jumps the trailer, and is chased by defendant. Detective Englar provided that once Mr. Connor turned the corner near his apartment, defendant could be seen stopping and running in the direction of his apartment.

Detective Englar estimated that based on his review of the surveillance video, the route run by Mr. Connor and defendant that day was approximately 172 yards. Dr. Troxclair, a medical examiner, testified that Mr. Connor sustained three gunshot wounds. She determined that his cause of death was multiple gunshot wounds, and his manner of death was classified as a homicide. She said that gunshot numbers one and three were fatal because they went through the left and right femoral arteries. She indicated that gunshot number one entered the front of his thigh. She explained that since the exit would for gunshot number three was higher up on the thigh, Mr. Connor's leg wound have to be bent if the perpetrator was in front of him. She confirmed that this could be consistent with someone running toward another person, who was firing a gun at them. Dr. Troxclair opined that it would not be possible to sustain two severed arteries and then run 175 yards afterwards. In addition, she confirmed that the "wounds were consistent with someone facing the shooter at the time he was shot, possibly with the leg extended as if running[.]"

At trial, the jury heard that the victim and defendant each had a gun that day. Based on his review of the surveillance video, Detective Englar believed that Mr. Connor was armed with a revolver and that defendant was armed with a Glock handgun. Defendant's gun was subsequently found behind the apartments, but the gun carried by the victim was not found. He believed that the other individuals present that day might have moved the gun. While discussing the videotape, the

detective confirmed that defendant could be seen stopping near the corner of Mr. Connor's apartment complex. Detective Englar indicated that four shell casings matching "that 9 millimeter" were located at the exact place they saw defendant stop in the video.[42] Detective Englar, who also reviewed a presentation of the ballistic evidence recovered from the scene, explained that the evidence recovered from that day matched a 9 mm Glock pistol. He stated this was the same kind of weapon that was recovered from the scene, which contained defendant's DNA. He denied that any of the projectiles discovered that day were consistent with a revolver.[43]

While defendant did not testify, his statements to the police were published to the jury. Defendant asserted that he was defending himself from Mr. Connor, who was the aggressor. Defendant claimed that on the way back from the store, Mr. Connor addressed him on "some hype sh*t." He later told the detective that he believed the camera showed defendant point his finger at the victim. Defendant also explained that he told the victim, "f*ck you, you on heroine [sic], I ain't worrying about you." He believed that this made Mr. Connor "go get a gun for [him]." Defendant explained to the detective that he "walked off" after the initial confrontation. He stated, "We bout to go inside and chill inside really. But I'm like man bae f*ck that! N*gga ain't goin run me, I'm a go to the park!" He further stated, "I can go to the park, he ain't goin stop me from going to no park, let's go!" Defendant alleged that Mr. Connor then came across the street with a "whole gun" while they were on their way to the park.

---

[42] The detective later indicated that these four casings matched the 9 mm Glock pistol that was located behind the apartments with a profile consistent with defendant's DNA.

[43] As previously noted, Ms. Terrebonne, a firearm and toolmark expert, testified that numerous fired cartridge casings found at the crime scene were fired from defendant's Glock handgun. She was unable to determine that the copper jacket and copper projectile was fired in that gun, but she could say they were consistent with that type of gun.

Defendant asserted that Mr. Connor told him that he was going to make him "use that b*tch," after which he pointed the gun at defendant. Defendant stated that when Mr. Connor pointed his gun towards him, he "came out my book sack and I went to shooting at, at him with my sh*t." He explained that he ran behind "a man on some sh*t cause he pointed his gun at me." He alleged that defendant ran behind a car and pointed the gun at him. Defendant told the detective that he was "in a rage" and not in "his right mind anymore." He explained that the victim shot eight times. He claimed that he stopped shooting when Mr. Connor ran toward people and cars.

The jury heard defendant's self-serving statement, which Detective Englar pointed out was inconsistent with the physical evidence in this case. Defendant alleged that Mr. Connor pointed a gun at him and shot at him eight times; however, no ballistic evidence was recovered that showed a gun consistent with the type Mr. Connor had was fired that day. Additionally, defendant asserted that he stopped firing when Mr. Connor ran in the direction of people, but the physical evidence and witness testimony demonstrated that ballistic evidence was recovered around Mr. Connor's apartment door. The other testimony that supported defendant's theory of self-defense was that of his girlfriend, Ms. Beasley, who admitted that she previously told the police that she did not believe Mr. Connor was going to shoot and that he was "fake stunting." She also ran away when she saw Mr. Connor and did not see the actual shooting take place. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal. *See Griffin*, *supra*.

Additionally, before returning outside from his apartment, defendant admitted that he armed himself with a weapon. The jury may have reasoned that, at the point when Mr. Connor approached with a gun, defendant, who was located

near his apartment, could have left the scene.[44] Even if Mr. Connor was armed, the jury could have concluded that by running away, he was disengaging from the conflict, and defendant was no longer acting in reasonable self-defense when he fired his gun multiple times and chased defendant until he reached his apartment door. Also, the State presented evidence that supported that Mr. Connor was shot closer to his apartment and not near the location of the altercation between them. Four casings, which matched defendant's weapon, were located near the corner of Mr. Connor's apartment, there was a bullet hole found in the mop outside Mr. Connor's apartment door, and there was projectile damage to the door. Dr. Troxclair testified that an individual who suffered two severed arteries, like Mr. Connor, would not have been able to run the equivalent of the total distance run by him and defendant that day. Under these circumstances, the jury could have concluded that defendant became the aggressor and the claim of self-defense was not supported by the facts.

Further, after the shooting, defendant fled the scene, discarded the weapon, and eventually relocated to Houma for seven months. These actions are inconsistent with the theory of justifiable homicide. *See State v. Wallace*, 612 So.2d 183, 191 (La. App. 1 Cir. 1992), *writ denied*, 614 So.2d 1253 (La. 1993). A defendant's flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. *State v. Cazenave*, 00-183 (La. App. 5 Cir. 10/31/00), 772 So.2d 854, 860, *writ denied*, 00-3297 (La. 10/26/01), 799 So.2d 1151.

In the instant case, the jury was presented with conflicting versions of the events. The jury is the ultimate fact-finder in determining whether the State

---

[44] The law does not permit an individual to track down his enemy, shoot him with a firearm, and then claim justification for the homicide because of prior threats. *State v. Patterson*, 10-415 (La. App. 5 Cir. 1/11/11), 63 So.3d 140, 149, *writ denied*, 11-338 (La. 6/17/11), 63 So.3d 1037 (citing *State v. Arabie*, 496 So.2d 554, 558 (La. App. 1 Cir. 1986), *writ denied*, 502 So.2d 565 (La. 1987)).

negated self-defense beyond a reasonable doubt.  *See Griffin*, *supra*.  Here, after the jury was presented with all of the evidence, they did not believe the shooting was done in self-defense.  *See State v. Bowers*, 51,545 (La. App. 2 Cir. 8/9/17), 244 So.3d 586, *writ denied*, 17-1637 (La. 6/15/18), 257 So.3d 685 (where the Second Circuit held that the evidence was sufficient to support a verdict that the shooting of the victim was not in self-defense.  The appellate court indicated that even if the victim was armed, by running away, he was disengaging from the conflict, and the defendant was no longer acting in reasonable self-defense.  In addition, the defendant demonstrated that lethal force was not immediately necessary when he shot into the ground, and the men, including the victim, then fled the front yard.  The appellate court held that there was a factual basis in the record to support the conviction, and the jury's decision was reasonably based on a credibility call, and as such, it should not be disturbed on appeal).[45]  As such, a rational jury could have found that the State proved beyond a reasonable doubt that defendant did not act in self-defense.

Defendant also asserts that the verdict is based on insufficient evidence because the evidence established provocation and heat of passion sufficient for manslaughter.  La. R.S. 14:31(A) defines manslaughter as "[a] homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person

---

[45] In *Bowers*, *supra*, the appellate court indicated that the case hinged on whether the jury believed the defendant was acting in self-defense, and there was significant disagreement between the witnesses as to whether the victim had a gun, and whether he was attempting to shoot the defendant when the defendant shot the victim.  The evidence at trial indicated that the police recovered three spent shell casings from the defendant's gun and no spent shell casings from the victim's alleged handgun.  A live round was found under the victim's body when he was moved.  The Second Circuit mentioned that while this was consistent with the defendant's testimony that the victim's gun jammed as he attempted to shoot the defendant, no gun was found on or near the victim, and the witnesses denied removing any gun from the victim's clothes.  *Id*. at 594.  In addition, a medical examiner testified that the victim's wound was consistent with him running, and the physical evidence suggested that he was shot in the back while retreating from the defendant.  *Id*. at 594-95.

of his self-control and cool reflection. "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors that may reduce the grade of the offense. *State v. Thompson*, 14-764 (La. App. 5 Cir. 1/28/15), 167 So.3d 884, 889; *State v. Bauman*, 08-1169 (La. App. 5 Cir. 5/12/09), 15 So.3d 177, 185, *writ denied sub nom.*, *State ex rel. Bauman v. State*, 09-1533 (La. 4/23/10), 34 So.3d 300.

In order to be entitled to the lesser verdict of manslaughter, as well as to the lesser verdict of attempted manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. *See Thompson*, 167 So.3d at 890; *Bauman*, 15 So.3d at 185. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. *State v. Deal*, 00-434 (La. 11/28/01), 802 So.2d 1254, 1260, *cert. denied*, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d, 42 (2002). The question for the reviewing court is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *Thompson*, *supra*.

In the instant matter, the jury evidently found that defendant failed to meet his burden of proving that he acted in "sudden passion" or "heat of blood." We find that the evidence supports the jury's conclusion.

As noted previously, defendant and Mr. Connor initially had a verbal altercation prior to the shooting. Afterwards, Mr. Connor went to his apartment before returning outside with a gun. It was established that defendant also armed himself with a gun before they decided to leave their apartment again to walk their dog. According to Ms. Beasley's testimony and defendant's statement, Mr. Connor crossed the street, pointed a gun at them, and told defendant that he was going to make him use his weapon. In his statement, defendant alleged that he

became scared when he saw the weapon and had to defend himself. He claimed that defendant was trying to aim at him when he got down behind the car. Defendant alleged that he stopped shooting the gun when Mr. Connor ran in the direction of people.

However, there was differing testimony about the actual shooting. Ms. Nelson denied that she saw Mr. Connor approach the person that he was arguing with that day. She testified that she did not witness Mr. Connor point his gun at that person. She denied that either of them had a gun. As discussed, Detective Englar testified about the events captured on the surveillance video from that date. When discussing this video, Ms. Beasley denied that was "how it went." Although she claimed that Mr. Connor met them near one of their apartment complex's dumpsters, Ms. Beasley admitted that these dumpsters were not located within view of the surveillance video. She also confirmed that she did not see any of the figures in the surveillance video go around the corner toward her apartment. Witness testimony and physical evidence indicated that defendant chased Mr. Connor through the street until he reached his apartment door. Afterwards, defendant concealed the weapon and discarded it behind an apartment complex. He then received a ride out of the immediate area from Ms. Beasley's neighbor before fleeing to Houma for seven months.[46]

It was undisputed at trial that defendant and Mr. Connor both had guns on the day of the shooting. In his statement, defendant admitted that after having a verbal altercation with Mr. Connor, he armed himself with a weapon before going to walk his dog at the park.[47] He claimed that defendant came from across the

---

[46] A defendant's attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. *State v. Cazenave*, *supra*.

[47] This Court has noted that "an argument alone does not constitute sufficient provocation to reduce murder to manslaughter." *State v. Burse*, 19-381 (La. App. 5 Cir. 2/12/20), 289 So.3d 690, *writ denied*, 20-650 (La. 11/24/20), 305 So.3d 104; *State v. Thompson*, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1267, *writ denied*, 18-2077 (La. 9/6/19), 278 So.3d 372 (citing *State v. Johnson*, 06-623 (La. App. 3 Cir. 11/2/06), 941 So.2d 696, 702, *writ denied*, 06-3024

street, pointed a gun at him, and he started shooting. He also alleged that defendant shot at him eight times and that he believed the victim hit something. Despite defendant's assertions, there was no testimony or evidence presented that Mr. Connor fired a weapon that day. Ms. Terrebonne indicated that the gun visible in Mr. Connor's hand in the surveillance video appeared to be consistent with a revolver. The testimony established that none of the ballistic evidence recovered from the crime scene in this case was consistent with being fired from a revolver. However, as discussed, Ms. Terrebonne testified that numerous fired cartridge casings found at the crime scene were fired from defendant's Glock handgun. She was unable to determine that the copper jacket and copper projectile were fired from that gun, but indicated that they were consistent with this type of gun.

Even if the jurors believed that at some point during the incident Mr. Connor may have provoked defendant, they apparently concluded that any such provocation by him was insufficient to deprive an average person of self-control, but rather that defendant acted with deliberation and reflection, thus warranting a verdict of second degree murder rather than manslaughter. Provocation is a question of fact that must be determined by the trier of fact. *State v. Scott*, 09-138 (La. App. 4 Cir. 11/18/09), 26 So.3d 283, 288, *writ denied*, 09-2773 (La. 6/18/10), 38 So.3d 320. By returning a guilty verdict, it appears the jury did not find that

---

(La. 9/14/07), 963 So.2d 995). Furthermore, in cases where a defendant armed himself with a deadly weapon prior to engaging a victim, this Court has concluded the trier of fact could have found the mitigatory factors were not established by a preponderance of the evidence. *See State v. Francois*, 13-616 (La. App. 5 Cir. 1/31/14), 134 So.3d 42, 52, *writ denied*, 14-431 (La. 9/26/14), 149 So.3d 261 (Circumstances were insufficient to deprive a reasonable person of his self-control and cool reflection where the defendant armed himself before proceeding to the victim's residence and the victim did not initiate a confrontation or exhibit provocative or aggressive behavior before being shot.); *State v. Mills*, 04-489 (La. App. 5 Cir. 3/29/05), 900 So.2d 953, 961, *writ denied*, 05-1470 (La. 1/13/06), 920 So.2d 235 (The defendant failed to show sufficient provocation to warrant a verdict of manslaughter when the defendant and the victim engaged in a verbal altercation prior to the defendant leaving the room and returning with a gun.).

defendant established the mitigatory factors of "sudden passion" and "heat of blood" by a preponderance of the evidence.[48]

Considering the circumstances of this case, we find that the arguments raised by defendant relating to the sufficiency of the evidence are without merit. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant did not act in self-defense and that defendant failed to carry the burden necessary to reduce the conviction to manslaughter.

## ASSIGNMENT OF ERROR NUMBER ONE

### *Allen charge*

In this assignment of error, defendant argues that the trial court erred in giving an improper *Allen*[49] charge in its last instruction to the jury and that he is thus entitled to remand for a new trial. Specifically, defendant asserts that following three hours of deliberations, the jury informed the court that they could not reach a verdict on the charge of second degree murder. He alleges that the trial court first promised the jury that it would respect its decision when it returned. He maintains that after an hour, the jury returned with eleven jurors voting for second degree murder and one juror voting for manslaughter. He claims that the judge assumed that the holdout juror's vote had been a mistake, stating: "I don't know if the polling slip was filled out improperly by one of the jurors, but one of the jurors filled out a slip without Second Degree Murder on it." He contends that the court did not verify whether the juror's vote was a mistake; however, the court implied that the juror had made a mistake before returning the jury to the jury room to fill out the forms to reflect a unanimous vote. As such, defendant argues that the trial

---

[48] Although the law may extend some limited indulgence to passion justly excited, it does not indulge revenge. *Patterson*, *supra*.

[49] *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

court seems to have directly told the holdout juror that she had failed to perform her duty by voting for manslaughter.

In response, the State provides that defendant challenges the second jury charge given by the trial judge, contending that it was a coercive *Allen* charge. The State clarifies that this issue does not involve an improper *Allen* charge, but rather it involves the trial court's instructions to the jury after they indicated that they had reached a verdict. The State asserts that the judge's instructions were permissive. It avers that the instructions did not rise to the level of an improper *Allen* charge, nor did they imply that the trial court would not accept a mistrial.

During their deliberations, the jury presented two questions to the trial court. The questions read: "In regards to manslaughter, could we have more clarity on the definition of an 'average' person?"; "In regards to manslaughter, can you elaborate on the 'heat of the moment'"; and "Does manslaughter mean there is no intent? (is there intent in manslaughter)." The jury was returned to the courtroom, and the trial judge said that she would start off by reading the instructions regarding manslaughter in response to their question about intent, which she did. The judge further said that she would read the definition of specific criminal intent, which she did. The judge also responded to the jury's questions regarding an "average person" and "heat of the moment." The judge provided the legal definition of "heat of passion." Afterwards, the jury returned to deliberations.

The record reflects that at 5:20 p.m., the jury sent a note to the judge, "Cannot agree on verdict for Count 1. We do have a verdict for Count 3." The trial judge stated to the parties, "So we pulled the Allen or Dynamite charge. There's a whole Dynamite charge." After being questioned about what was proposed to be read to the jury, the judge informed the parties that this was the "updated Dynamite charge" as of October 2021. The judge explained that there

was a formal version and an informal version. She stated that she was fine with whichever one the parties decided.

The State informed the judge that this type of charge has been criticized and disapproved for use in criminal cases, and the judge replied, "okay, I agree with that." After discussion with the State and defense counsel, the judge told the parties that she was going to ask the jury to continue to deliberate and that the court would abide by their decision.

After the parties confirmed, the trial judge instructed the bailiff to bring the jury back into the courtroom. The judge then provided the following:

> Okay. Ladies and Gentlemen, the question is, "Cannot agree on verdict for Count 1. We do have a verdict for Count 3." I'm going to please, please, please ask you Ladies and Gentlemen to be as patient with each other as you possibly can. Remember that this is a very serious matter. We're going to abide by your decision, whatever it is. If you cannot decide this case, the next time you come back, I will accept that, but we would all be very grateful to you if you can continue to deliberate and we're asking you to please try once more. Okay.

Afterwards, the jury informed the court that it had returned a verdict of guilty of second degree murder as to count one and guilty of aggravated criminal damage to property as to count three. The transcript reflects the following: "The Court: Ladies and Gentlemen of the jury, is that your verdict? (WHEREUPON, JURY ANSWERS AFFIRMATIVELY)." At that time, defense counsel requested that the jury be polled. Polling revealed that one juror's slip indicated "guilty" to manslaughter, which conflicted with the jury's affirmative statement that it had reached a verdict. The judge then stated the following:

> I have to send them back.

> All right, Ladies and Gentlemen of the jury, I have to read you the jury instruction. And the jury instruction reads, you will be 12 in number and all of you must agree to reach a verdict to convict or acquit the defendant. Okay?

> So it has to be a 12-0 verdict. So I'll have to send you to the back. I don't know if the polling slip was filled out improperly by one of the jurors, but one of the jurors filled out a slip without second degree

murder on it. I don't know what the decision was in the back and we'll have to do it again. It has to be 12-0. Okay?

Defense counsel moved for a mistrial, asserting that anything else beyond that point would be coercive to the holdout juror. The State responded that there could have been a misunderstanding with the form. The State indicated that the jurors appeared a "little bit shocked." The State suggested that the trial judge could offer the jury to fill the form out again. The State maintained that the jury had informed the court that it came back with a unanimous verdict, and therefore, it would be appropriate to ask them if they wished to conduct polling again. The judge stated, "I just want to make sure there's no mistake." The following exchange occurred:

**The Court:** Okay. All right, Ladies and Gentlemen, as I stated earlier, the verdict has to be 12-0. I need to understand— let me just ask in general if you have a unanimous verdict. Let me just ask that question. It has to be 12-0, unanimous. Okay.

So, unanimous means that everybody voted for the same thing. Unanimous doesn't mean you have a verdict, but everybody voted for the same verdict. That's what it means. I don't know if there's some confusion with that.

So with that said, I'm going to send you back or I can give you another polling slip, everybody fill it out again, but unanimous means unanimous verdict or 12-0 means that everyone voted for the same verdict. That's what it means if there's some confusion about that.

So, you don't have to answer out loud right now, but that's what it means and I just need you to understand that. I can give you another polling slip. All of you raise your hand if you want another polling slip or I can send you to the back. Okay, we'll start all over again.

**The State:** And Your Honor, can you just—I just ask for the record that all of the jurors have to raise their hand for another polling slip.

**The Court:** They all did. Let the record reflect. I think everybody raised their hand. Is there anyone who does not want another polling slip? Okay. All right, we'll get—this is the first set.

Defense counsel asserted that there was no provision allowing for the trial court to poll the jury twice. Counsel contended that it was coercive to the holdout juror that they did something wrong. At a bench conference, the judge stated, "All right. I say let them fill out again. And if it comes back the same thing, then it is what it is." After filling out the slips a second time, the jury was polled again, after which the trial judge ordered that both sets of polling slips be sealed. The judge confirmed that the verdict was unanimous on each count.

With regard to count one, at 7:25 p.m., the first set of polling slips shows that the last polling slip reflects that the juror circled, "2. Guilty of Manslaughter" beneath the section that states, "As to the charge of La. Rev. Stat. 14:30.1- Second Degree Murder, what was your individual verdict? (Please Circle)[.]" The slips reflect eleven votes for guilty of second degree murder and one vote for guilty of manslaughter. At 7:36 p.m., the second set of polling slips were completed by the jury, showing a unanimous verdict for guilty of second degree murder.[50]

The *Allen* charge stems from the United States Supreme Court's decision in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). *State v. Caston*, 561 So.2d 941, 942 (La. App. 2 Cir. 1990). In *Allen*, the court approved of a charge designed to break a jury deadlock and achieve jury unanimity. *Caston*, 561 So.2d at 942; *State v. Eugene*, 03-1128 (La. App. 5 Cir. 1/27/04), 866 So.2d 985, 991, *writ denied*, 04-515 (La. 1/14/05), 889 So.2d 263 (citing *State v. Collor*, 99-175 (La. App. 4 Cir. 4/26/00), 762 So.2d 96, 104, *writ denied*, 00-1487 (La. 3/9/01), 786 So.2d 116). The main focus of the original *Allen* charge was that the jury minority, regardless of whether they were for conviction or acquittal, should

---

[50] On December 6, 2021, defendant filed a "Motion for New Trial and Motion for Post Verdict Judgment of Acquittal." Defendant based his motion for new trial on the grounds that the trial court erred by not granting a mistrial. After arguments, the trial court denied this motion on that same date. However, on appeal, defendant does not focus on the trial court's denial of his motion for new trial.

reconsider the reasonableness of their opinion because it was not shared by a majority of the jury. *Caston*, 561 So.2d at 942.

The Louisiana Supreme Court has banned the use of the *Allen* charge and subsequent modifications of it. *Collor*, *supra* (citing *State v. Nicholson*, 315 So.2d 639 (La. 1975)). While the Supreme Court recognized the authority of a trial court to give further instructions to a jury unable to agree upon a verdict, it found the *Allen* charge problematic for two reasons. First, the charge emphasized that the jury had a duty to reach a verdict, implying that the trial judge would not accept a mistrial. Second, when the duty to reach a verdict is coupled with an admonition by the trial judge that those in the minority should rethink their position, there exists an almost overwhelming pressure to conform to the majority's view. *Id.* (citing *State v. Campbell*, 606 So.2d 38, 40 (La. App. 4 Cir. 1992)). Therefore, if a trial judge gives an *Allen* charge or any "coercive modification" of same, the trial court will have committed reversible error. *Collor*, *supra* (citing *Nicholson*, *supra*).

There is no requirement that a judge declare a mistrial at the initial sign of trouble. *State v. Anders*, 06-589 (La. App. 3 Cir. 9/27/06), 941 So.2d 93, 101 (citing *State v. Lowenfield*, 495 So.2d 1245 (La. 1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986)). It is within the discretion of the trial court to urge jurors to come to an agreement. *Anders*, *supra* (quoting *State v. Governor*, 331 So.2d 443 (La. 1976)).

In the instant case, defendant asserts that the trial judge gave the jury two instructions—the second of which was an impermissible *Allen* charge. However, as noted by the State, it appears that the alleged *Allen* charge that defendant complains of actually occurred after the jury indicated that it had reached a verdict and was subsequently polled. Defendant contends that the trial court seemed to

have directly told the holdout juror that she had failed to perform her duty when she voted for manslaughter instead of second degree murder.

Regarding the trial court's first instruction to the jury, as evidenced by the record, the jury informed the court that it was unable to come to an agreement. The trial court and the parties subsequently discussed using an informal version of an *Allen* charge. Following further discussions, the court instructed the jury to be patient with each other and to remember that this was a very serious matter. The court also told the jury that it would abide by its decision and that the trial court would be grateful if they could continue to deliberate.

The trial court's charge regarding further deliberations did not include the elements that the United States Supreme Court found problematic in *Allen*. First, the instruction did not imply that the trial judge would not accept a mistrial. It is well-settled that utilizing the phrase "I am going to urge you to come to an agreement," is not palpable abuse. *Governor*, 331 So.2d at 453 (citing *State v. Rodman*, 208 La. 523, 23 So.2d 204 (1945)); *State v. Seals*, 135 La. 602, 65 So. 756 (1914); *State v. Fuselier*, 51 La.Ann. 1317, 26 So. 264 (1899); *State v. Dudoussat*, 47 La.Ann., 977, 17 So. 685 (1895) ("It is safe to state as a settled proposition that when the Court is informed by a jury that they cannot agree, it is not error for the Court to impress upon them the importance of the case, urge them to come to an agreement, and send them back for further deliberation; for the question of the discharge of the jury because of inability to agree on a verdict is within the sound discretion of the trial judge, and the exercise of that discretion will not be set aside in the absence of palpable abuse.")

Also, in the instant case, the trial court did not attempt to coerce the jury members holding the minority viewpoint to accept the majority position; rather, the trial court emphasized the importance of patience and reminded the jury of the serious nature of the matter. It is unlikely that the jurors interpreted the judge's

request that the jury practice "patience and understanding" in their deliberations in hopes of reaching a verdict as an implication that the court would not accept a mistrial. *Eugene*, 866 So.2d at 991. *See State v. Wilson*, 01-625 (La. App. 3 Cir. 12/28/01), 806 So.2d 855, 858, *writ denied*, 02-323 (La. 9/13/02), 827 So.2d 1121 (holding that the charge given by the trial court did not rise to the level of an *Allen* charge or a modified *Allen* charge when the trial court did not imply to the jurors that it would not accept a mistrial or attempt to coerce the jury members holding the minority viewpoint to accept the majority position).

As previously noted, the Louisiana Supreme Court has recognized that there will be times when a court may wish to give supplemental instructions after the jury has retired and that the determination of when such supplemental instructions shall be given is in the discretion of the trial court. *Nicholson*, 315 So.2d at 643. However, in cases where the instructions given by the trial court constitute an *Allen* charge or a modified *Allen* charge, the reviewing court shall find reversible error. *See State v. Dabney*, 05-53 (La. App. 5 Cir. 6/28/05), 908 So.2d 60, 67 (holding that where the trial court told the jurors twice that they had a duty to reach a verdict and attempted to coerce the jury members who held the minority viewpoint to accept the majority position, the instruction constituted a modified *Allen* charge); *Campbell*, *supra* (holding that instruction to jurors in the minority view to strongly consider the position of the majority and that they have a duty to reach a verdict was coercive and required reversal). Here, the elements of an impermissible *Allen* charge exemplified in *Dabney* and *Campbell*, *supra*, are not present in the charge given by the trial court to the jury.

Turning to defendant's contention that the judge's instructions during polling were impermissible, the procedure for the written polling of the jury is set forth in La. C.Cr.P. art. 812, which provides, in pertinent part:

A. The court shall order the clerk to poll the jury if requested by the state or the defendant. The poll shall be conducted in writing by applying procedure of this Article, and shall be done in open court.

B. (1) The proper procedure for the written polling of the jury shall require that the clerk hand to each juror a separate piece of paper containing the name of the juror and the words "Is this your verdict?" Each juror shall write on the slip of paper the words "Yes" or "No" along with his signature. The clerk shall collect the slips of paper, make them available for inspection by the court and counsel, and the record the results.

(2) If a sufficient number of jurors as required by law to reach a verdict answer "yes" the clerk shall so inform the court. Upon verification of the results, the court shall order the clerk to record the verdict and order the jury discharged. If an insufficient number required to find a verdict answer "Yes," the court may remand the jury for further deliberation, or the court may declare a mistrial in accordance with Article 775[.] …[51]

(Internal footnote added.)

In similar circumstances, the court in *State v. Brooks*, 633 So.2d 659 (La. App. 1 Cir. 1993), *writ denied*, 94-308 (La. 5/20/94), 637 So.2d 475, affirmed a conviction when the trial court's poll of the jury revealed an insufficient number of votes to return a guilty verdict. The trial court explained that ten jurors must agree to return a guilty verdict. *Id.* When the jury foreman stated there had been ten guilty votes in the jury room, the trial court asked if any of the jurors had changed their minds. Thereafter, the trial court ordered the jury to return to the jury room, reminding them again that ten jurors must agree on a verdict. *Id.* at 663. Based on the juror polling, the defense moved for a mistrial or a mistrial by hung jury; the trial court denied the motion. The First Circuit held there had been no abuse of discretion in the trial court's ruling because the jury had initially returned with a

---

[51] "A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial." *State v. Smith*, 04-340 (La. App. 5 Cir. 10/26/04), 888 So.2d 280, 285. "Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion." *Id.* The standard to judge whether a mistrial should have been granted is whether the defendant "suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial." *State v. Smith*, 433 So.2d 688, 696 (La. 1983); *State v. Cushenberry*, 407 So.2d 700 (La. 1981).

verdict, although polling revealed it was not a legal verdict. Thus, there had been no acquittal or deadlocked jury. The First Circuit held that the trial court properly exercised its discretion, as provided in La. C.Cr.P. art. 812, by having the jury return for further deliberations after advising them that ten votes were needed to reach a verdict. *Id.*

In *State v. Haynes*, 99-1973 (La. App. 1 Cir. 6/23/00), 762 So.2d 1247, 1254-55, *writ denied*, 00-2243 (La. 6/15/01), 793 So.2d 1236, when the jurors were initially polled, three members of the jury responded "no" when asked if the verdict to convict was their verdict. The court noted the verdict was incorrect and asked that the jury be re-polled; a proper verdict (10-2) was then returned. The court found that the trial court's actions were not coercive, but merely an attempt to clarify the jury's signal that a proper verdict had been reached. The court stated that the record did not support the defendant's claim that the juror changed her vote from "guilty" to "not guilty." Rather, it appeared that the juror was correcting an error. The court held that while it would have been a better practice, upon counting three "no" votes, to remand the jury for more deliberation or to determine on the record whether the initial polling was erroneous or if further deliberations were needed, a mistrial is required only where the jury is unable to reach a verdict by proper concurrence.

Upon review, we find that a mistrial was not required under the instant circumstances. Here, the jury initially indicated that it had reached a verdict in this matter. The judge noted that the verdict was incorrect, asked if the jurors wanted to be re-polled, and the jury indicated that they did, after which a proper unanimous verdict was returned. The record does not support a conclusion that trial court's actions were coercive, but were merely an attempt to clarify the jury's signal that a proper verdict had been reached. Also, the record reflects that the

judge inquired as to whether the jurors wanted to be re-polled, and all twelve agreed. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER THREE

### *Admission of CAC video*

In assignment of error number three, defendant complains that the trial court erred in admitting the CAC video. He argues that the contents of the CAC video added nothing of relevance to the State's case, but provided prejudicial emotional evidence in the form of a "9-year old child that could not be cross-examined, meaningfully countered, or contextualized." He asserts that the CAC video served "no independent relevant purpose other than to provide victim impact testimony from a child soon after she experienced a severe trauma." He maintains that the effect was to inflame the jury's sympathies and introduce irrelevant and prejudicial evidence into the trial. As such, defendant requests that this Court vacate his convictions and sentences and remand the case to the trial court for a new trial.

The State responds that the trial court did not abuse its discretion in allowing the CAC video. The State asserts that the interviewed witness, K.C., was nine years old at the time her father was shot and killed and that she was thirteen years old when she testified at trial. The State contends that K.C.'s trial testimony was very brief, and she indicated that she could not remember in response to questions. The State maintains that K.C.'s forensic interview was much closer in time to the event. As such, the State asserts that the evidence was relevant and provided a detailed account of the incident. The State contends that the probative value of the CAC video was not substantially outweighed by its prejudicial effect. Nonetheless, the State asserts that any purported error would be harmless.

On October 18, 2021, the State filed a notice of additional information wherein it provided K.C.'s statements about the events of the shooting. On that same date, defense counsel filed a motion *in limine* to prohibit the introduction of

any victim impact testimony and of the video containing the interview of the victim's daughter at the CAC.

Prior to the start of the trial testimony on October 18, 2021, the trial court and the parties discussed defendant's motion *in limine*. The State asserted that the CAC video did not have any unduly prejudicial victim impact testimony within it. The State indicated that it intended to play the entire CAC video. When the judge questioned counsel about his objection, defense counsel indicated that the tape and drawings that the child made were provided during discovery. Counsel explained that the State assured him that he would not introduce the drawings. Thereafter, the trial judge suggested that defense counsel listen to the CAC video, and if there was anything prejudicial to his client, counsel bring it to the attention of the court or the State before the tape is played.

On October 19, 2022, the trial court heard defense counsel's objection on the issue of the introduction of the CAC video. Defense counsel argued that the video was duplicative of K.C.'s trial testimony, which the jury already heard. Counsel asserted that the purpose of the statute allowing for video testimony is to protect the child from any trauma or stress associated with testifying in court. Defense counsel argued that K.C. had already testified and was asked the same questions as the ones in the CAC video. In response, the State contended that the videoed interview, which was conducted shortly after the incident, provided additional information beyond K.C.'s testimony. The judge overruled defense counsel's objection, stating that there were multiple cases where testimony might be duplicated. Further, the judge repeated that she had asked defense counsel and the State to review the tape beforehand. Defense counsel noted its objection.

Later at trial, on October 20, 2022, before the CAC video was played for the jury, defense counsel raised another objection to the introduction of the evidence. Counsel maintained that the video did not comply with the requirements of

*Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

The State contended that the statute only required that the protected person be made available. Afterwards, the judge indicated that K.C. had not been released from her subpoena yet. The judge further provided that defense counsel was instructed to inform the court of what he wanted extracted from the video and had not done so. The judge overruled the objection. After the video was played, defense counsel moved for a mistrial, arguing that the forensic interview was reversible error. Counsel asserted that there were improper questions, answers, hearsay, and victim impact statements. The State objected to the defense's motion. The judge denied the defense's request for a mistrial.

Pursuant to La. R.S. 15:440.2(C)(1), K.C. was a "protected person" by virtue of being under the age of seventeen and a witness in a criminal proceeding.[52] La. R.S. 15:440.4 and 15:440.5 both determine whether a videotaped statement of a protected person may be admitted into evidence. La. R.S. 15:440.4(A) provides:

> A. A videotape of a protected person may be offered in evidence either for or against a defendant. To render such a videotape competent evidence, it must be satisfactorily proved:
>
> (1) That such electronic recording was voluntarily made by the protected person.
>
> (2) That no relative of the protected person was present in the room where the recording was made.
>
> (3) That such recording was not made of answers to interrogatories calculated to lead the protected person to make any particular statement.
>
> (4) That the recording is accurate, has not been altered, and reflects what the protected person said.

_____

[52] La. R.S. 15:440.2(C) defines a "protected person" as follows:

> C. For purposes of this Part "protected person" means any person who is a victim of a crime or a witness in a criminal proceeding and who is any of the following:
>
> (1) Under the age of seventeen years.
>
> (2) Has a developmental disability as defined in R.S. 28:451.2(12).
>
> (3) An adult as defined in R.S. 15:1503 who is eligible for protective services pursuant to the Adult Protective Services Act.

(5) That the taking of the protected person's statement was supervised by a physician, a social worker, a law enforcement officer, a licensed psychologist, a medical psychologist, a licensed professional counselor, or an authorized representative of the Department of Children and Family Services.

La. R.S. 15:440.5 provides, in pertinent part:

A. The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:

(1) No attorney for either party was present when the statement was made;

(2) The recording is both visual and oral and is recorded on film or videotape or by other electronic means;

(3) The recording is accurate, has not been altered, and reflects what the witness or victim said;

(4) The statement was not made in response to questioning calculated to lead the protected person to make a particular statement;

(5) Every voice on the recording is identified;

(6) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by either party;

(7) The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and

(8) The protected person is available to testify.

B. The admission into evidence of the videotape of a protected person as authorized herein shall not preclude the prosecution from calling the protected person as a witness or from taking the protected person's testimony outside of the courtroom as authorized in R.S. 15:283. Nothing in this Section shall be construed to prohibit the defendant's right of confrontation.

\* \* \*

In the present matter, Ms. Millet, who conducted the CAC interview, identified the video and stated that she was alone with K.C. during the interview, non-leading questions were asked of K.C, the forensic interview was both audio and video recorded, and everyone that spoke was identified. Ms. Millet also confirmed that K.C.'s interview was made voluntarily. Thus, the CAC video of

K.C. met all of the statutory requirements for admissibility and the video was available for defense inspection.

Contrary to defendant's assertions, K.C. testified at trial, and he had the opportunity to cross-examine her. His constitutional right to confrontation of K.C. was not violated. Thus, there is no merit to his argument that he was deprived of his right to confront K.C.[53] Further, the defense was provided the CAC video prior to trial and was specifically instructed by the trial judge to inform the court of any statements that the defense wished to be redacted, and did not do so. Accordingly, we find no error in the trial court's admitting the videotape. This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

### *Admission of obstruction of justice charge evidence*

In his fourth assignment of error, defendant asserts that the trial court erred in admitting extraneous, prejudicial testimony and photos regarding the obstruction of justice charge, to which he had pleaded guilty prior to trial. Defendant provides that the State introduced evidence and photographs through the testimony of Officer Dionne. He asserts that this evidence was cumulative, irrelevant, and removed from the crime. He argues that this evidence was prejudicial because it focused on defendant's flight from the police. Defendant contends that the evidence unfairly obscures the fact that the police did not believe Ms. Beasley about Mr. Connor having a gun and deflects from the police's failure to search for Mr. Connor's gun. Accordingly, defendant requests that this Court vacate his convictions and sentences and remand the matter for a new trial.

---

[53] Further, where the declarant is present to appear for cross-examination, the Confrontation Clause places no constraints at all on the use of the declarant's prior testimonial statement. *See State v. Hawkins*, 11-193 (La. App. 4 Cir. 11/16/11), 78 So.3d 293, 298, *writ denied*, 11-2782 (La. 4/13/12), 85 So.3d 1246. The core protection in the Sixth Amendment Confrontation Clause is the right to confront the accuser. *Id.*

The State responds that defendant's argument is factually incorrect since he was charged in the bill of indictment that on March 14, 2018, defendant "did obstruct justice by tampering with evidence in a murder investigation by intentionally removing the handgun he used to commit the murder of Kerwin Connor from the scene[.]" The State further asserts that defendant's obstruction charge did not pertain to the events in Houma, where the contested evidence was seized approximately seven months after the shooting. In addition, the State avers that the contested photographs of these items were already introduced into evidence as State's Exhibit 61A-E without objection. The State contends that by the time Officer Dionne testified, other witness testimony established that Ms. Beasley and defendant went to Houma following the shooting, defendant stayed there until his arrest seven months later, and Ms. Beasley provided him with living essentials.

Nevertheless, even if the objection was timely and not moot, the State maintains that State's Exhibits 62-67 were properly admitted into evidence at trial. The State asserts that this evidence was relevant to establish defendant's consciousness of guilt and to the credibility of Ms. Beasley's testimony. Also, the State asserts that it was entitled to present all evidence necessary for cohesiveness to assist the jury in its fact-finding process. The State also contends that the verdict rendered in this case was surely unattributable to the alleged error.

In the present case, Officer Dionne testified at trial as to his involvement in the execution of a search warrant at 2683 Express Boulevard in Houma, Louisiana, on October 20, 2018. He identified photographs of items that were seized during that search. He described that the photographs showed the following: one of the rooms in the residence, a debit card, two cell phones, a receipt that was seized, and

a close-up of a receipt.[54]  The State then asked Officer Dionne to identify each of

the corresponding physical items that were seized that day.

At that time, defense counsel objected to the relevancy of the evidence

because defendant had pled guilty to the obstruction of justice charge.  Counsel

averred that this evidence seemed related to that charge.  The State responded that

the evidence was relevant to show defendant's flight.  Also, the State asserted that

the evidence was relevant as to Ms. Beasley's credibility.  The judge overruled the

objection.  Afterwards, Officer Dionne provided that he retrieved video evidence

from the Dollar General store in Houma based on the receipt as well.  Defense

counsel noted his previous objection.

Relevant evidence is defined by La. C.E. art. 401 as "evidence having any

tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be

without the evidence."  All relevant evidence is admissible, except as otherwise

provided by law.  La. C.E. art. 402.  Although evidence is relevant, it may be

excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of

undue delay, or waste of time.  La. C.E. art. 403.  The determination concerning

relevancy of evidence is within the discretion of the trial judge whose rulings will

not be disturbed in the absence of an abuse of discretion.  *State v. Winfrey*, 97-427

(La. App. 5 Cir. 10/28/97), 703 So.2d 63, 75, *writ denied*, 98-264 (La. 6/19/98),

719 So.2d 481 (citing *State v. Carter*, 96-358 (La. App. 5 Cir. 11/26/96), 685

So.2d 346, 351).

In the present case, defendant was charged as to count two with obstruction

of justice "by tampering with evidence in a murder investigation by intentionally

---

[54] Officer Dionne confirmed that this was a receipt from the Dollar General store at 2693 "Grand Cayo Road" in Houma, Louisiana.

removing the handgun he used to commit the murder of Kerwin Connor from the crime scene" in violation of La. R.S. 14:130.1. As discussed, defendant pled guilty to this count prior to trial on October 18, 2021. Upon review, we find that this contested evidence is not related to defendant's removal of the handgun in this case. Therefore, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER FIVE

### *Misleading jury instruction*

In his final assignment of error, defendant maintains that the trial court erred by including an extraneous, unhelpful, out-of-context jury instruction pertaining to specific intent in the legal definition of second degree murder. He contends that the State requested the following special jury charge over his objection: "The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill." Defendant further contends that the instruction improperly caused the jury to conclude that second degree murder was the correct verdict. He asserts that the State referred to the act of aiming a lethal weapon and discharging it in the direction of the victim three times in its closing arguments. He avers that a "permissible version of the jury instructions would include some direction that a defendant pointing and firing a weapon in the direction of the victim also supports a finding of manslaughter." As such, he contends that the error was not harmless.

The State avers that the trial court properly included its requested jury charge. With respect to defendant's argument that the jury should have been given this instruction as to manslaughter, the State asserts that the failure of defense counsel to object on this ground precludes appellate review of this issue.

On October 21, 2021, the State filed "State's Request for Special Jury Instructions." The charge at issue is as follows:

"The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill." *State v. London*, 07-473 (La. App. 5 Cir. 11/27/07), 973 So.2d 782, 788-89 (internal citations omitted).

During the jury charge conference, the defense argued that the inclusion of the above jury instruction gave the impression that this alone would be enough. Defense counsel argued that the instruction would add confusion as to what is required. In response, the State asserted that this was a direct quote from this Court's opinion in *London*, *supra*, and it was not misleading because aiming a lethal weapon and discharging in the direction of the victim is sufficient to prove specific intent to kill. The trial court stated that the jury charge only said that it supports a finding of specific intent. The judge found that this was something that the jurors could consider pursuant to the language in *London*, *supra*. The judge noted defense counsel's objection. The trial judge subsequently provided this instruction to the jury.

La. C.Cr.P. art. 802 mandates that the trial court instruct the jury on the law applicable to each case. *State v. Butler*, 462 So.2d 1280, 1285 (La. App. 5 Cir. 1985), *writ denied*, 541 So.2d 886 (La. 1989). La. C.Cr.P. art. 807 mandates that a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly pertinent and correct. It need not be given if it is included in the general charge or in another special charge to be given. *Id.* The evidence presented at trial must support the requested special charge. *State v. Batiste*, 06-824 (La. App. 5 Cir. 3/13/07), 956 So.2d 626, 636, *writ denied sub nom.*, *State ex rel. Batiste v. State*, 07-892 (La. 1/25/08), 973 So.2d 751. Furthermore, the Louisiana Supreme Court has consistently held that a jury charge must be considered as a whole, and particular expressions in a charge must be construed in the context of the entire charge. Thus, it has declined to reverse the conviction on the ground of an erroneous charge unless the disputed portion, when

considered in connection with the remainder of the charge, is erroneous and prejudicial. *State v. Motton*, 395 So.2d 1337 (La. 1981), *cert. denied*, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981); *State v. George*, 346 So.2d 694 (La. 1977).

La. C.Cr.P. art. 801(C) provides: "A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error." This Court has held that a defendant is required to make a timely objection under La. C.Cr.P. art. 801 in order to preserve a jury charge issue for review. *See State v. Gardner*, 05-62 (La. App. 5 Cir. 6/28/05), 907 So.2d 793, 801. Defense counsel did not raise the additional ground that he now raises on appeal—that the judge failed to direct the jury that this also supported a finding of manslaughter. As such, this new basis for objection was not preserved for appellate review.

In the instant case, defendant did make a timely objection to the trial judge's decision to include the jury charge at issue—"The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill."—because it would be misleading and cause confusion.

In *State v. Green*, 19-123 (La. App. 5 Cir. 12/26/19), 286 So.3d 1230, *writ denied*, 21-51 (La. 3/9/21), 312 So.3d 583, *cert. denied*, -- U.S. --, 142 S.Ct. 206, 211 L.Ed.2d 88 (2021), cited by the State, the defendant argued that the trial court erred by including the State's requested special charge about specific intent. In that case, pursuant to the State's request, the trial court included the following in the jury instructions: "Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill.

*State v. Broaden*, 99-2124 (La. 2/21/01), 780 So.2d 349, 362."[55]  *Id*. at 1244.  On appeal, the defendant argued that this requested charge was irrelevant, extraneous, and prejudicial.  He asserted that the charge was already covered in other jury charges regarding criminal intent.  Further, the defendant maintained that this instruction, which mirrored the victim's account of the shooting, could be viewed as giving credibility to his testimony instead of allowing the jury to evaluate the circumstances on their own and could have been seen by the jury as the trial court's endorsement of the State's allegation.  *Id*.

This Court, however, found no error in the trial court's inclusion of the State's requested jury charge.  Under one theory of second degree murder, the State had to prove that the defendant had the specific intent to kill or to inflict great bodily harm with respect to counts one and two.  With respect to count three, attempted second degree murder, the State had to prove defendant had specific intent to kill.  This Court pointed out that at trial, Mr. Lamb testified that defendant pointed a gun at his face and shot him.  Thus, the evidence presented at trial supported the requested special charge.  Further, this Court found that the special charge did not require qualification, limitation, or explanation, and it was not included in the general charge or in another special charge.  Accordingly, this Court held that the arguments raised by the defendant in this assigned error were without merit.  *Id*. at 1245.

At trial, K.C. testified that she heard gunshots and looked out of the window and saw a man chasing her father.  In her CAC interview, she told Ms. Millet that she saw that man with a gun and that he was firing as her father was running away.  Additionally, surveillance video from Clemson Place was played for the jury.  Detective Englar asserted that defendant could be seen in the video chasing Mr.

---

[55] The U.S. Supreme Court has denied certiorari in this matter.  *See Broaden v. Louisiana*, 534 U.S. 884, 22 S.Ct. 192, 151 L.Ed.2d 135 (2001).

Connor. Testimony and evidence was presented at trial that established that ballistic evidence, including projectiles, jackets, and fired cartridge casings, was collected from the scene that day. Ms. Terrebonne testified that multiple fired cartridge casings found at the scene were fired from defendant's gun, which was submitted for testing. Defendant admitted in his statement that he fired his gun at Mr. Connor as well.

In light of the foregoing, we find that the trial judge did not abuse her discretion by including the State's requested jury charge. Under the theory of second degree murder presented at trial, the State had to prove that defendant had the specific intent to kill or inflict great bodily harm with respect to count one. The State presented evidence that defendant pointed a gun at Mr. Connor and fired multiple shots at him. As such, the evidence presented at trial supported the requested charge. Further, the special charge did not require qualification, limitation, or explanation, and that it was wholly pertinent and correct. The special charge was not included in the general charge or in another special charge. Therefore, this assignment of error is without merit.

## ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920, *State v. Oliveaux*, 312 So.2d 337 (La. 1975), and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990).

### *Written Motion to Reconsider Sentence*

Shortly after defendant's sentences were imposed, on December 6, 2021, defense counsel orally moved for reconsideration of sentence. In the motion, counsel noted that defendant has no prior criminal record and that the sentences were the maximum sentences allowed. Counsel stated, "I'll supplement that in writing." The trial judge responded, "Okay. That's denied. You may supplement in writing[.]"

On December 7, 2021, defense counsel filed a timely written motion to reconsider. In it, counsel noted that defendant was sentenced to forty years for obstruction of justice. Counsel asserted that defendant accepted responsibility for that offense and that he pled guilty before the start of the trial. Defense counsel explained that defendant was sentenced to fifteen years at hard labor for aggravated criminal damage to property. Counsel averred that the trial court failed to consider potentially mitigating factors such as defendant's young age, lack of a criminal record, his acceptance of responsibility for the obstruction of justice charge, and the fact that these two crimes were not especially heinous. Defense counsel concluded that these maximum sentences and the life sentence imposed on him for second degree murder are unconstitutionally excessive.

The order attached to the written motion provided that "IT IS ORDERED that the District Attorney for the Parish of Jefferson show cause on the 6th day of December, 2021, at 8:45 a.m. why the defendant's Motion to Reconsider should not be granted." The trial judge signed the order on December 8, 2021. Additionally, the order also contained: "This Motion was made orally and denied on 12-6-2021 JBD" and "The Court ordered Mr. Thomas to follow up with a writte [sic] motion JBD."

La. C.Cr.P. art. 881.4 provides that if it is "necessary to an appropriate disposition of a motion to reconsider sentence, the appellate court may remand the case to the district court with instructions to supplement the record or to hold an evidentiary hearing."[56] However, upon review, we find that the trial judge's language in its December 8, 2021 order could reasonably be interpreted as the court indicating that the written motion to reconsider sentence was one and the

---

[56] La. C.Cr.P. art. 916(3) provides that the trial court retains jurisdiction to "[c]orrect an illegal sentence or take other appropriate action pursuant to a properly made or filed motion to reconsider sentence."

same as the defense counsel's December 6, 2021 oral motion to reconsider sentence, which had already been denied on December 6, 2021. As such, because we find that the trial court ruled on the written motion to reconsider sentence, no corrective action is necessary.

***Guilty Plea Sentence Discrepancy***

There appears to be a discrepancy regarding the imposed sentence as to count two for obstruction of justice. When the trial judge actually imposed the sentence, the transcript reflects that she stated, "As to count 2, the obstruction of justice, it is the sentence of this Court that you serve **four years** of hard labor." (Emphasis added.) Shortly thereafter, the State entered a *nolle prosequi* on defendant's other charges, and it requested that defendant be remanded pending his current transportation to the Department of Corrections. The trial judge indicated that she and defendant needed to complete the *Boykin* form. The judge provided, "Let me make the record clear that [defendant] pled guilty in Case 18-6525 to the obstruction of justice charge and sentencing was deferred until today and the obstruction of justice was the **40 years**." (Emphasis added.)[57]

However, it appears that upon sentencing defendant as to count two, the trial court may have mistakenly stated four years instead of forty years or this could be a typographical error in the transcript. Further, the sentencing minute entries and the State of Louisiana Uniform Commitment Order ("UCO") both reflect that defendant was sentenced to forty years at hard labor on count two. In their appellate briefs, the parties agree that defendant was sentenced to forty years on count two. Accordingly, no corrective action is necessary in this regard.

---

[57] The transcript generally prevails when there is a discrepancy between the transcript and the minute entry. *See State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

***Concurrent Nature of Sentences***

The December 6, 2021 sentencing minute entry and the *Nunc Pro Tunc* minute entry for that date reflect: "The Court ordered that the above sentence is to run concurrently with each count, and any and every sentencing the Defendant may be serving." The UCO indicates that the sentences are concurrent with "each count, and any and every sentence the defendant may be serving." The sentencing transcript reflects that the trial judge said: "Counts 1, 2, 3 are ordered to run concurrently with each other and concurrently *with any other sentence* with credit for all time served from the date of the arrest." (Emphasis added.)

La. C.Cr.P. art. 879 provides that "[i]f a defendant who has been convicted of an offense is sentenced to imprisonment, the court shall impose a determinate sentence." Upon review, we find that defendant's sentences are indeterminate because the trial court did not specify whether the sentences were ordered to run concurrently with specific sentences imposed or simultaneously with any other sentences imposed that defendant may have been serving at the time of his sentencing. This Court has recognized this distinction in sentencing, finding the "open-ended" statement that a sentence be served with "any other sentence" is distinguishable from a sentence ordered to be served concurrently with "any sentence [the defendant] may be serving," requiring correction. *See State v. Jones*, 13-367 (La. App. 5 Cir. 12/27/13), 131 So.3d 1065, 1070. Accordingly, we vacate defendant's sentences and remand this matter to the trial court for resentencing. *See State v. Nellon*, 18-385 (La .App. 5 Cir. 12/19/18), 262 So.3d 441, 445.[58]

---

[58] In *Nellon*, *supra*, the transcript reflected that the trial judge ordered the defendant's two sentences to run "concurrent with any other sentence." The UCO, however, more specifically stated that the sentences "shall be concurrent with any or every sentence the offender is now serving" and additionally reflected that the sentences are to be served concurrent with "any other sentence the Defendant may be serving [in] Jefferson, 24th JDC." This Court found the defendant's sentences to be indeterminate because the trial judge in sentencing the defendant did not specify whether the sentences were ordered to run concurrently with specific sentences imposed or with any other sentences imposed that the defendant may have been serving at the time of his sentencing. *Id*. at 445.

*Post-Conviction Relief Advisal*

The sentencing minute entry indicates that defendant was advised that he had "two (2) years after judgment of conviction and sentence has become final to seek post-conviction relief." However, a review of the transcript of the proceedings on December 6, 2021 reveals that the trial judge did not advise defendant of the prescriptive period for filing post-conviction relief. The transcript generally prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

Therefore, on remand, after resentencing, the trial court is ordered to advise defendant that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

## DECREE

For the foregoing reasons, defendant's convictions are affirmed. For the reasons expressed above, defendant's sentences are vacated and the matter is remanded for resentencing and advisal of post-conviction relief as per La. C.Cr.P. art. 930.8, as instructed above.

**CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MAY 24, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

**22-KA-282**

### E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JUNE B. DARENSBURG (DISTRICT JUDGE)
ANDREA F. LONG (APPELLEE)          DOUGLAS E. RUSHTON, JR. (APPELLEE)          THOMAS J. BUTLER (APPELLEE)
MEGHAN H. BITOUN (APPELLANT)

### MAILED

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053